PEOPLE v CLINE

Docket No. 268604. Submitted August 8, 2007, at Detroit. Decided
September 18, 2007, at 9:00 a.m. Leave to appeal sought.

Stephen H. Cline was convicted by a jury in the Huron Circuit Court
of one count of kidnapping, MCL 750.349, and 17 counts of
first-degree vulnerable-adult abuse, MCL 750.145n(1), for repeat-
edly manipulating the insulin levels of his blind, diabetic wife to
render her unconscious before binding her with ropes, placing
plastic bags over her head to restrict her breathing, and videotap-
ing the results for his sexual gratification. The court, Richard M.
Knoblock, J., sentenced the defendant to concurrent prison terms
of 25 to 40 years for kidnapping and 10 to 15 years on each count
of abuse, which was a departure from the statutory sentencing
guidelines. The defendant appealed.

   The Court of Appeals *held*:

   1. The defendant was not deprived of his right to the effective
assistance of counsel by his attorney's failure to move for a change
of venue, which would have been futile under the totality of the
circumstances. The existence of 11 newspaper articles regarding
the case is insufficient to show that the atmosphere surrounding
the trial created a probability of prejudice, and the percentage of
the jury pool that was excused for bias during voir dire was not
sufficiently high, at 36 percent, to engender a presumption of
widespread community hostility toward the defendant, particu-
larly given that only nine of the 14 jurors who were seated
admitted having heard about the case before trial.

   2. Sufficient evidence was presented to support the defen-
dant's conviction of first-degree vulnerable-adult abuse. The statu-
tory definition of a vulnerable adult is properly read as including
individuals age 18 or over whose age, developmental disability,
mental illness, or physical disability affect them in such a way that
they require supervision, require personal care, or lack the per-
sonal and social skills required to live independently. Accordingly,
the victim qualified as a vulnerable adult both because she was
suspected of being or believed to be abused, neglected, or exploited,
and because she required personal care as a result of her blindness
and diabetes.

3. The court did not abuse its discretion in departing from the sentencing guidelines on the basis that, because the defendant's offense-variable scores were at the upper limit of the applicable sentencing grids, the guidelines did not adequately allow for consideration of the fact that the defendant was convicted of 18 counts of crimes against a person. Although the trial court mentioned the defendant's age and future dangerousness at the sentencing hearing, it did not list these factors in its written sentencing departure evaluation forms, indicating that it either did not rely on them in departing from the guidelines or would have departed to the same extent without them. Accordingly, the defendant is not entitled to resentencing.

Affirmed.

CRIMINAL LAW — VULNERABLE-ADULT ABUSE — DEFINITIONS.

The statutory definition of a vulnerable adult includes individuals age 18 or over whose age, developmental disability, mental illness, or physical disability affect them in such a way that they require supervision, require personal care, or lack the personal and social skills required to live independently (MCL 750.145m[u][i]).

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *Mark Gaertner*, Prosecuting Attorney, and *Nancy Mullett,* Special Assistant Attorney General, for the people.

State Appellate Defender (by *Randy E. Davidson*) for the defendant.

Before: DAVIS, P.J., and SCHUETTE and BORRELLO, JJ.

SCHUETTE, J. Defendant appeals as of right his December 22, 2005, jury conviction of one count of kidnapping, MCL 750.349, and 17 counts of first-degree vulnerable-adult abuse, MCL 750.145n(1). Defendant was sentenced to concurrent prison terms of 25 to 40 years for kidnapping and 10 to 15 years on each count of first-degree vulnerable-adult abuse. Defendant received 241 days' credit for time served in jail. We affirm.

## I. FACTS

This case arises out of defendant's abuse of his wife, Linda Cline, who is completely blind and is a brittle, type I diabetic.[1] Linda and defendant first met in January 2001 at the Commission for the Blind training school in Kalamazoo, Michigan.[2] They started a romantic relationship at the end of January 2001, and they married on September 21, 2002.

After being hospitalized in April 2005, Linda had trouble speaking. She wondered if she had been deprived of oxygen or had suffered a stroke. Shortly thereafter, while cleaning her and defendant's apartment, Linda discovered ropes and a digital camera, which, after asking a friend to examine it, she learned contained photos of her hogtied, nude, and lying face down.[3] Linda also discovered three videotapes, one of which depicted several incidences of her being tied up or bound, either naked or scantily clad, with a bag over her head, struggling to breathe. Defendant appeared in some of the scenes. Linda did not recall making the videotape, and she did not consent to it. During a police interview, defendant stated that, except for one occasion, these activities were consensual and that he was sexually aroused by them.

## II. EFFECTIVE ASSISTANCE OF COUNSEL

Defendant first argues that he was deprived of his right to the effective assistance of counsel when defense

---

[1] Type I diabetes mellitus is an insulin-dependent form of the disease. *Stedman's Medical Dictionary* (26th ed, 1995), p 473. Brittle diabetes mellitus is characterized by "marked fluctuations in blood glucose concentrations that are difficult to control." *Id.* at 472.

[2] Defendant is legally blind because he has problems with peripheral and night vision, but he can still read and drive a car.

[3] Linda also discovered other items in the apartment: a duffel bag that contained plastic bags, rubber bands, and a sex toy; more ropes; a roll of plastic wrap; and crates with short skirts, corsets, and nylons.

counsel failed to move for a change of venue in this case. We disagree.

### A. STANDARD OF REVIEW

The determination whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The court must first determine the facts and then decide whether those facts constitute a violation of the constitutional right to the effective assistance of counsel. *Id.* The trial court's factual findings are reviewed for clear error, while its constitutional determinations are reviewed de novo. *Id.*

### B. ANALYSIS

An accused's right to counsel encompasses the right to the "effective" assistance of counsel. US Const, Am VI; Const 1963, art 1, § 20; *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 674 (1984). Reversal of a conviction is required where counsel's performance falls below an objective standard of reasonableness, and the representation so prejudices the defendant as to deprive him of a fair trial. *Strickland*, *supra* at 687-688. The defendant must overcome the presumption that counsel's actions were based on reasonable trial strategy. *Id.* at 689. "[T]his Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). However, counsel will still be found ineffective on the basis of a strategic decision if the strategy employed was not a sound or reasonable one. *People v Dalessandro*, 165 Mich App 569, 577-578; 419 NW2d 609 (1988).

In this case, the trial court drew 56 prospective jurors. Twenty (36 percent) were excused for cause after they admitted to being exposed to pretrial publicity and having already formed an opinion of defendant's guilt. Defendant asserts that eight of the 12 deliberating jurors[4] (67 percent) admitted that they had heard about the case before trial. Although the record does not indicate which 12 members of the selected jury panel of 14 ultimately decided the case, the record does confirm that nine of the 14 jurors admitted they had heard about the case before trial.

"Whether a defendant's conviction will be reversed depends on whether, under the 'totality of circumstances,' the defendant's trial 'was not fundamentally fair' and held before 'a panel of impartial, "indifferent" jurors.' " *People v DeLisle*, 202 Mich App 658, 665; 509 NW2d 885 (1993), quoting *Murphy v Florida*, 421 US 794, 799; 95 S Ct 2031; 44 L Ed 2d 589 (1975). "[I]t remains open to the defendant to demonstrate 'the actual existence of [a preconceived notion regarding guilt or innocence] in the mind of the juror as will raise the presumption of partiality.' " *Murphy*, *supra* at 800, quoting *Irvin v Dowd*, 366 US 717, 723; 81 S Ct 1639; 6 L Ed 2d 751 (1961). "[T]he general rule [is] that where potential jurors can swear that they will put aside preexisting knowledge and opinions about the case, neither will be a ground for reversing a denial of a motion for a change of venue." *DeLisle*, *supra* at 662. "[W]hen citizens have been sworn to tell the truth, and testify under oath that they can be impartial, the initial presumption is that they are honoring their oath and are being truthful." *Id.* at 663.

"Indicia of impartiality—such as a professed lack of knowledge about the case or claims that an opinion

---

[4] Two jurors were selected as alternates.

could be set aside—might be disregarded where the general atmosphere in the community or the courtroom is sufficiently inflammatory," as indicated by a prevalence of persons with preconceptions of the case, which is demonstrated by prospective jurors with such preconceptions and inflammatory media coverage. *DeLisle, supra* at 666-669. However, "[t]he existence of pretrial publicity, standing alone, does not necessitate a change of venue." *People v Passeno*, 195 Mich App 91, 98; 489 NW2d 152 (1992), overruled on other grounds by *People v Bigelow*, 229 Mich App 218 (1998).

> Rather, . . . [a] defendant must show that there is either a pattern of strong community feeling against him and that the publicity is so extensive and inflammatory that jurors could not remain impartial when exposed to it, or that the jury was actually prejudiced or the atmosphere surrounding the trial was such as would create a probability of prejudice.
>
> When a juror, although having formed an opinion from media coverage, swears that he is without prejudice and can try the case impartially according to the evidence, and the trial court is satisfied that the juror will do so, the juror is competent to try the case. [*Id.* at 98-99 (internal citations omitted).]

The defendant in *DeLisle* was convicted of four counts of first-degree premeditated murder, MCL 750.316, and one count of attempted first-degree murder, MCL 750.91, stemming from having driven a station wagon occupied by his wife and four children into the Detroit River. *DeLisle, supra* at 659. Nearly 100 news articles were published about the killings in the months leading up to the June 1990 trial. *Id.* at 668. Defendant in the case at hand has submitted as evidence of prejudice 11 articles about his case published in local newspapers. Six of the articles discuss the facts of the case, including the prosecutors' perceptions of

the facts and evidence, and track the procedural status of the case. The other five address the proposal and passage of anti-torture legislation, noting that the legislation was prompted by defendant's case.

The mere existence of these 11 articles is insufficient to show that "the atmosphere surrounding the trial was such as would create a probability of prejudice." *Passeno, supra* at 98. While the six articles dealing with the case itself discuss more than just its status, they do not "reveal the kind of inflammatory community atmosphere that might sometimes justify disregarding the jurors' claims of impartiality." *DeLisle, supra* at 669. Only one article is an opinion piece, and that article is specifically focused on the introduction and passage of the anti-torture legislation.

Moreover, in *People v Jendrzejewski,* 455 Mich 495, 517; 566 NW2d 530 (1997) (citations and internal quotation marks omitted), the Supreme Court explained as follows:

> Consideration of the quality and quantum of pretrial publicity, standing alone, is not sufficient to require a change of venue. The reviewing court must also closely examine the entire voir dire to determine if an impartial jury was impaneled. In *Patton v Yount,* 467 US 1025; 104 S Ct 2885; 81 L Ed 847 (1984), the Supreme Court suggested that a proper review includes independent examination of the nature of the publicity surrounding the trial, voir dire testimony of the venire as a whole, and the individual voir dire testimony of the jurors eventually seated. In this state, as in the United States Supreme Court, the general rule holds that if a potential juror, under oath, can lay aside preexisting knowledge and opinions about the case, neither will be a ground for reversal of a denial of a motion for a change of venue.
>
> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospec-

tive juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

The assumption "that a fair juror is one who lacks knowledge about a case . . . is both legally and logically incorrect. It is the policy of this state that prior impressions or opinions, not positive in character, do not mandate disqualification." *Id.* at 517-518.

In *DeLisle*, 31 percent of the jury venire (21 out of 68) was excused because of bias. *Id.* at 667. The *DeLisle* Court concluded that "the number of jurors excused for bias during voir dire was not sufficiently high to presume that the jurors chosen were part of a community deeply hostile to defendant." *Id.* at 669. In this case, 36 percent of the venire was excused for bias. Although a little higher than the number in *DeLisle*, this number is not so high as to engender the presumption of widespread community hostility toward defendant. Further, the number of seated jurors in the case at hand who admitted having heard about the case before trial was less than in *DeLisle*. Again, nine of the 14 jurors seated in this case admitted that they had heard about the case before trial. Comparatively, all of the 14 seated jurors in *DeLisle* admitted having heard the general facts of the case, with five having heard of the defendant's confession, and one having heard of a purported prior attempt by the defendant to murder his family. *Id.* at 667-668.

In sum, the totality of the circumstances surrounding the jury selection in the instant case does not overcome the seated jurors' assurances that they could decide the case impartially. Accordingly, because the court would not have erred in denying a motion to change venue, defendant was not deprived of his right to a fair trial by defense counsel's failure to raise such a motion. "[T]rial

counsel cannot be faulted for failing to raise an objection or motion that would have been futile." *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998).

### III. SUFFICIENCY OF THE EVIDENCE

Next, defendant argues that there was insufficient evidence to convict him of first-degree vulnerable-adult abuse under MCL 750.145n(1) because the victim, Linda Cline, was not a "vulnerable adult" as defined by the statute. Again, we disagree.

### A. STANDARD OF REVIEW

Challenges to the sufficiency of the evidence are reviewed de novo. *People v Wolfe*, 440 Mich 508, 513-515; 489 NW2d 748, amended on other grounds 441 Mich 1201 (1992). A court must "view the evidence in a light most favorable to the prosecution and determine if any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *Id.* at 515. Resolution of this issue also involves a question of statutory interpretation, which is also reviewed de novo. *People v Buehler*, 477 Mich 18, 23; 727 NW2d 127 (2007).

### B. ANALYSIS

Defendant was charged with 17 counts of first-degree vulnerable-adult abuse under MCL 750.145n(1), which provides as follows:

A caregiver is guilty of vulnerable adult abuse in the first degree if the caregiver intentionally causes serious physical harm or serious mental harm to a vulnerable adult. Vulnerable adult abuse in the first degree is a felony punishable by imprisonment for not more than 15 years or a fine of not more than $10,000.00, or both.

"Vulnerable adult" is defined by MCL 750.145m(u) in part as follows:

> (*i*) An individual age 18 or over who, because of age, developmental disability, mental illness, or physical disability requires supervision or personal care or lacks the personal and social skills required to live independently.

> *   *   *

> (*iii*) An adult as defined in section 11(b) of the social welfare act, MCL 400.11.

MCL 400.11 states in relevant part:

> (b) "Adult in need of protective services" or "adult" means a vulnerable person not less than 18 years of age who is suspected of being or believed to be abused, neglected, or exploited.

> *   *   *

> (f) "Vulnerable" means a condition in which an adult is unable to protect himself or herself from abuse, neglect, or exploitation because of a mental or physical impairment or because of advanced age.

Defendant argues that Linda is not a "vulnerable adult" as contemplated by the Legislature. Defendant's argument is primarily based on MCL 750.145m(u)(*i*). However, we conclude that Linda qualifies as a vulnerable adult under § 145m(u)(*iii*) because she was "a vulnerable person not less than 18 years of age who is suspected of being or believed to be abused, neglected, or exploited." MCL 400.11(b). It was alleged that defendant abused and exploited Linda by manipulating her insulin so as to cause her to become unconscious, placing plastic bags over her head that restricted her breathing, tying her up in various stages of undress, and videotaping her for his sexual pleasure. Linda's

blindness and brittle diabetes are physical conditions that defendant took advantage of to render her unconscious and thus "unable to protect . . . herself from [such] abuse, neglect, or exploitation." MCL 400.11(f).

In a footnote to his brief, defendant argues that MCL 400.11(b) does not apply because "[t]here is no indication in the complaint . . . that at the time of the alleged acts, the complainant was already suspected of being abused, neglected, or exploited." This argument rests on a portion of the language of MCL 400.11(b) that is consistent with the statutory scheme of which it is a part, but is not essential to identifying the category of adult implicated. The definition provided in MCL 400.11(b) applies to "sections 11a to 11f." MCL 400.11. Sections 11a to 11f set forth a duty to report suspected adult abuse, neglect, or exploitation, and a procedure for doing so. Thus, the reference in § 11(b) to "suspected" abuse, neglect, or exploitation is consistent with the reporting requirements set forth in the subsequent sections, i.e., the requirement to report is predicated on the existence of a suspicion. However, the "suspected" language has nothing to do with identifying the adults at issue.

Linda also qualifies as a vulnerable adult under MCL 750.145m(u)(*i*). Again, § 145m(u)(*i*) defines vulnerable adult as "[a]n individual age 18 or over who, because of age, developmental disability, mental illness, or physical disability *requires supervision or personal care or lacks the personal and social skills required to live independently*." (Emphasis added.) The highlighted portion of the definition can be read two ways: (1) the four cited personal characteristics (age, developmental disability, mental illness, physical disability) affect the individual in such a way that the individual requires (a) supervision to live independently, (b) personal care to live

independently, or (c) help with personal and social skills to live independently; or (2) the four cited personal characteristics affect the individual in such a way that the individual (a) requires supervision, (b) requires personal care, or (b) lacks the personal and social skills required to live independently.

We believe that the former interpretation is strained and that the latter is more consistent with the text. The highlighted portion of the statute contains a series of three clauses of equal rank connected by the conjunction "or." The Legislature could have presented this series as it did the first in the sentence (i.e., the four cited personal characteristics) by separating the first two with a comma and the last with a comma and the coordinating conjunction. The choice to use the coordinating conjunction to connect all the clauses signals that the prepositional phrase "to live independently" is an essential phrase clarifying what particular personal and social skills are referenced. In other words, the phrase "to live independently" is a definitional phrase that identifies the particular subset of "personal and social skills" that are lacking in the supposed vulnerable adult.

Further, to live "independently" means to live "[f]ree from the influence, guidance, or control of another," or without "relying on others for support, care, or funds; self-supporting." *The American Heritage Dictionary of the English Language* (1996), p 917 (defining "independent"). The first two consequences (needing supervision or personal care) implicitly acknowledge the presence of another, i.e., a supervisor or a caregiver, whose presence is required for the support and care of a person, and who exercises some level of influence or control over that person. "Supervise" is defined as "hav[ing] the charge and direction of," *id.* at 1804, and

"personal care" was defined by the Legislature to mean "assistance with eating, dressing, personal hygiene, grooming, or maintenance of a medication schedule as directed and supervised by a vulnerable adult's physician." MCL 750.145m(m). Thus, it is incongruous to say that a person under the supervision of another or being personally cared for by another is living independently. However, if the phrase "to live independently" is read as identifying the type of personal and social skills lacking in a particular person, the same incongruity does not exist.

Contrary to defendant's contentions, Linda requires some level of personal care as a result of her blindness and diabetes. While she testified that she can bathe, feed, and clothe herself and wash and dry her clothes (indicating she does not require assistance for her personal hygiene and grooming), she also testified that she requires assistance for cooking and grocery shopping, including depending on others to read "[l]abels, finding articles of food in the stores, getting to the store, guiding sometimes, getting from Point A to Point B." She stated that defendant took over the cooking because she "did it in a much slower fashion, sometimes [needing] assistance as to say what type of canned goods [she] was taking out of the cupboard." She also testified that she depended on defendant to read her mail to her. Finally, she also needed assistance in getting refills of prescriptions, indicating that she needs assistance in maintaining a medication schedule.

In sum, sufficient evidence was adduced below to establish that Linda was a vulnerable adult under both MCL 750.145m(u)(*i*) and (*iii*).

### IV. SENTENCING DEPARTURE

Finally, we reject defendant's argument that he is entitled to resentencing because the trial court failed to

articulate substantial and compelling reasons for departing from the sentencing guidelines in this case.

### A. STANDARD OF REVIEW

A trial court's decision to depart from the sentencing guidelines is reviewed for an abuse of discretion. *Buehler, supra* at 23-24. An abuse of discretion occurs when the result is outside the principled range of outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

### B. ANALYSIS

Generally, under the statutory sentencing guidelines, a minimum sentence must be imposed within the appropriate sentence range. *Babcock, supra* at 255-256. However,

[a] court may depart from the appropriate sentence range established under the sentencing guidelines set forth in chapter XVII if the court has a substantial and compelling reason for that departure and states on the record the reasons for departure. All of the following apply to a departure:

(a) The court shall not use an individual's gender, race, ethnicity, alienage, national origin, legal occupation, lack of employment, representation by appointed legal counsel, representation by retained legal counsel, appearance in propria persona, or religion to depart from the appropriate sentence range.

(b) The court shall not base a departure on an offense characteristic or offender characteristic already taken into account in determining the appropriate sentence range unless the court finds from the facts contained in the court record, including the presentence investigation report, that the characteristic has been given inadequate or disproportionate weight. [MCL 769.34(3).]

Additionally, " 'only those factors that are objective and verifiable may be used to judge whether substantial and compelling reasons exist . . . .' " *Babcock, supra* at 257, quoting *People v Fields*, 448 Mich 58, 62; 528 NW2d 176 (1995). " '[T]he reasons justifying departure should "keenly" or "irresistibly" grab [the Court's] attention, and [it] should recognize them as being "of considerable worth" in deciding the length of a sentence.' " *Id.*, quoting *Fields, supra* at 67. " '[T]he Legislature intended "substantial and compelling reasons" to exist only in exceptional cases.' " *Id.*, quoting *Fields, supra* at 68.

In this case, the calculated minimum sentence ranges were 135 to 225 months for the kidnapping conviction and 43 to 86 months for the first-degree vulnerable adult abuse conviction. The trial court explained its reason for departing from these minimum ranges at the sentencing hearing:

> Well, I presided over the trial so I'm very familiar with the facts of this case, viewed the videotape. And the videotape, which was a very, very disturbing experience for me and I think for anyone who's ever seen it.
>
> The conduct of this defendant is outrageous, sadistic, particularly considering . . . the fact that the victim . . . is physically incapacitated or physically limited and in addition was in an incapacitated condition caused by the defendant based on the evidence presented and he took advantage of that situation for his own sadistic purposes.
>
> This is conduct which is as I said in my opinion outrageous. The guidelines—the maximum sentence that the guidelines allow as scored is 18 years—the maximum minimum sentence is 18 years and nine months, Mr. Kloska has recommended 18 years.
>
> A review of the guidelines for the kidnapping charge indicates that the offense variable total points is 120, the grid only goes to a hundred, it's 100 plus.

I note from reviewing the grid that the various levels of the grid increase at 20 points. So if there was another level, he would be in that one, he'd be at 120 points, he'd be in the level—the next level beyond 6, although there isn't one.

I think . . . in my opinion that is . . . a substantial and compelling reason why the Court should consider going outside the guidelines.

In addition, I agree with Mr. Allen concerning OV 13, that variable refers to three or more crimes against a person. Here we're talking about innumerable, 17 convictions here, I don't think that the guidelines contemplated that kind of a situation when . . . it assessed the number of points that it did for three or more, this is beyond or more.

In my opinion . . . the other concern is the Court has to consider the . . . defendant himself, his age, the safety of the public and society, and at his age of 43 years I think he's gotta be kept away from society for a long time until there's a . . . reasonable belief that he can be safely returned to society.

And I don't think 18 years is enough time for a 43-year-old man, which is the age of Mr. Cline at this time.

Considering all the factors in this case, and as I said the reasons why I feel that there are substantial—in my opinion substantial and compelling reasons why the guidelines should be exceeded, and I'm going to exceed the guidelines in this case.

* * *

Now the reasons that I stated for exceeding the guidelines in that case are even more compelling in the assault cases, the vulnerable adult abuse cases. In that case the offense variable once again the grid cuts off at 120 points —strike that, it cuts off at 75 points, Level—OV Level 6 is 75 or more points, and Mr. Cline scores out at 135, almost double the 75 points on Level 6.

I think that in itself is a reason why the Court should exceed the guidelines, I think that clearly is a substantial and compelling reason.

In addition there is the other factor that I talked about, and that's OV 13, the three or more, and we're talking about many more than three or more. For those reasons, I am also going to exceed the guidelines as to the charges in Counts 2 through 18, the 17 counts of abuse of a vulnerable adult in the first degree. It will be the sentence of this Court that in each of those 17 cases the defendant be committed to the Michigan Corrections Commission and placed in the Commission's custody at the State prison of Southern Michigan, to be incarcerated for a minimum term of not less than ten years and a maximum term of not more than 15 years. And those sentences each will be served concurrently and concurrently with the sentence in Count 1, the kidnapping case.

In its departure evaluation form for kidnapping, the court set forth the following reasons in support of departure:

Offense variable 13 does not adequately contemplate a pattern of felonious criminal activity involving 18 crimes against a person. [T]he sentencing grid only contemplates offense variable levels of up to 100 . . . points. Defendant's score of 120 (or more if OV 7 provided the appropriate score) is in excess of what the grid contemplates and is not given adequate consideration. The sentencing guidelines do not take into consideration existing law which provides that the defendant will serve 18 sentences concurrently.

In its departure evaluation for first-degree vulnerable-adult abuse, the court set forth the following reasons in support of departure:

Offense variable 7 does not adequately take into account the fact that the defendant committed 18 separate acts of torture of the victim. Offense variable 13 does not adequately contemplate a pattern of felonious criminal activity involving 18 crimes against a person. The sentencing grid only contemplates offense variable levels of up to 75 . . . points. Defendant's score of 135 (or more if OV[s] 7 and 13 provided the appropriate score) is in excess of what

the grid contemplates and is not given adequate consideration. The sentencing guidelines do not take into consideration existing law which provides that the defendant will serve 18 sentences concurrently.

Defendant argues that the trial court erred by considering defendant's age and "future dangerousness" as a factor. We disagree. First, it does not appear that the trial court relied on defendant's age and future dangerousness as a reason for departing. But even if the trial court did rely on this invalid factor, we are satisfied that it would have departed to the same extent without it. Therefore, we conclude that defendant is not entitled to resentencing.

Defendant relies on Judge O'CONNELL's concurring opinion in *People v Havens*, 268 Mich App 15, 19; 706 NW2d 210 (2005), in which Judge O'CONNELL stated that the "sentencing court's classification of defendant as 'dangerous' and a 'serious threat' is not an objective finding of any factual event, but a statement of personal opinion." The sentencing court's statement referenced by Judge O'CONNELL in *Havens* is arguably similar to the trial court's statement in the instant case that defendant has "gotta be kept away from society for a long time until there's a . . . reasonable belief that he can be safely returned to society."

Defendant also cites *People v McKernan*, 185 Mich App 780, 782; 462 NW2d 843 (1990), quoting *People v Fleming*, 428 Mich 408, 424 n 17; 410 NW2d 266 (1987), in which this Court held that " '[a]ny predictions of a defendant's future behavior based on a status characteristic such as race, religion, gender, or age are suspect.' " *McKernan* stated that " '[a] reasonable sentence may include a limited consideration of defendant's age in terms of other permissible and relevant individual factors such as the absence or

presence of a prior record.' " *Id.*, quoting *Fleming*, *supra* at 424 n 17. In *McKernan*, this Court held that the trial court improperly considered the defendant's age in assessing the risk of recidivism. *Id.* Specifically, this Court stated:

> The trial judge's conclusion seems to be based on his own unsubstantiated personal view of a highly complex aspect of human psychology. The trial judge has simply concluded that an older person is more likely to be a repeat offender than a younger person. Before a sentencing judge can make such a conclusion, some scientific or psychological justification should be made part of the record and the defendant must be afforded the opportunity to challenge the court's belief at the sentencing hearing. [*Id.* at 782-783.]

While the trial court seemed to correlate defendant's age with the length of imprisonment needed before he could "be safely returned to society," it relied on other permissible and relevant factors to support its departure. As the trial court noted, defendant's OV scores were at the upper limits of the applicable sentencing grids. MCL 777.62; MCL 777.64. With respect to OV 7 (aggravated physical abuse), the statute only provides for two scores: 50 and zero points. MCL 777.37. Thus, a defendant who treated a victim with sadism, torture, or excessive brutality on a single occasion would be given the same score as defendant in the case at hand, who committed multiple acts of aggravated physical abuse of his wife. As for OV 13 (continuing pattern of criminal behavior), the statute provides for a score of 25 points where "[t]he offense was part of a pattern of felonious criminal activity involving 3 or more crimes against a person." MCL 777.43(1)(b). Again, defendant was convicted of 18 counts of crimes against a person.

A sentencing court "may depart from the guidelines range on the basis of an offense or offender character-

istic that was already considered in calculating the guidelines range if the court concludes 'that the characteristic has been given inadequate or disproportionate weight.' " *People v Schaafsma*, 267 Mich App 184, 186; 704 NW2d 115 (2005), quoting MCL 769.34(3)(b). Under the circumstances of this case, the trial court did not abuse its discretion in concluding that the guidelines did not adequately account for the aggravating factors in this case. Further, given that the trial court did not list defendant's age and future dangerousness as reasons for departure in either of its written sentencing departure evaluation forms, we are satisfied that the trial court did not rely on these factors in departing from the guidelines or, in the alternative, that it would have departed to the same extent without these invalid factors. Therefore, defendant is not entitled to resentencing. *Babcock*, *supra* at 260-261.

Affirmed.