# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

AURELIAS JUALIOUS MARSHALL,

      Defendant-Appellant.

UNPUBLISHED
April 11, 2017

No. 329362
Kent Circuit Court
LC No. 15-000706-FC

Before: BORRELLO, P.J., and WILDER and SWARTZLE, JJ.

PER CURIAM.

Following a jury trial, defendant, Aurelias Jualious Marshall, was convicted of felony murder, MCL 750.316(1)(b). The trial court sentenced defendant as a second-offense habitual offender, MCL 769.10, to life imprisonment without the possibility of parole. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

This appeal arises out of the conviction of defendant for the murder of Joel Battaglia in front of 1065 Lake Drive in Grand Rapids, Michigan, in the early morning hours of June 11, 1990. Battaglia was last seen by friends at a bar in Grand Rapids. Following the discovery of his body, the Grand Rapids police began an investigation, however, despite the fact that defendant's brother Acey Marshall told detectives that defendant hit Battaglia on the day of his death, no charges were filed against defendant.

The investigation of Battaglia's death was reopened in 2014, and investigative subpoenas were used in the investigation to Acey and Sheila Reed, who lived in the downstairs apartment at 1060 Lake Drive in 1990. Both testified pursuant to investigative subpoenas. Then, after they were charged with perjury, Acey and Sheila gave statements that placed defendant on Lake Drive when Battaglia was killed. Additional evidence was obtained from other individuals who testified that defendant told them that he had robbed and beaten a "white boy" in Grand Rapids. Following deliberations, the jury convicted defendant of felony murder. The trial court sentenced defendant has previously described and this appeal ensued.

## II. ANALYSIS

-1-

On appeal, defendant first argues that his conviction for felony murder was not supported by sufficient evidence. We review de novo a challenge to the sufficiency of the evidence. *People v Cline*, 276 Mich App 634, 642; 741 NW2d 563 (2007). We view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found that the prosecution proved the essential elements of the crime beyond a reasonable doubt. *Id.* The elements of a crime may be established by circumstantial evidence and reasonable inferences drawn from the evidence, *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013), noting that it is the jury's duty to determine the weight to be accorded any inferences. *Id.*

The elements of felony murder are (1) the killing of a human being, (2) with malice, i.e., the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specified in MCL 750.316(1)(b). *People v Smith*, 478 Mich 292, 318-319; 733 NW2d 351 (2007). In this case, the underlying felony was robbery.

Defendant argues there was insufficient evidence for the jury to find that he killed Battaglia with malice. In a prosecution for felony murder, malice may not be inferred solely from the intent to commit the underlying felony. *People v Kelly*, 423 Mich 261, 273; 378 NW2d 365 (1985); *People v Aaron*, 409 Mich 672, 728-729; 299 NW2d 304 (1980). However, "[t]he felony is a factor the jury may use to find malice." *Kelly*, 423 Mich at 273. "The facts and circumstances involved in the perpetration of a felony may evidence an intent to kill, an intent to cause great bodily harm, or a wanton and willful disregard of the likelihood that the natural tendency of [the] defendant's behavior is to cause death or great bodily harm." *Aaron*, 409 Mich at 728-729. In fact, "in many circumstances the commission of a felony, particularly one involving violence or the use of force, will indicate" malice. *Id.* at 730. Minimal circumstantial evidence is sufficient to prove a defendant's intent. *People v Henderson*, 306 Mich App 1, 11; 854 NW2d 234 (2014).

At trial, the evidence indicated that defendant did not act alone in killing Battaglia. In situations involving codefendants, the individual liability of each defendant must be shown. *People v Aaron*, 409 Mich at 731; *People v Flowers*, 191 Mich App 169, 178; 477 NW2d 473 (1991). One defendant may not be held liable for the unforeseen and unagreed-to results of another defendant. *Aaron*, 409 Mich at 731.

At trial, there was conflicting evidence regarding whom defendant acted with in killing Battaglia. Acey testified that he saw defendant and Malcolm Jeffries beat up a "white guy" on Lake Drive in 1990. But Guadalupe Harwood, defendant's neighbor for several years testified that defendant said that he and his brother were involved in a murder in Grand Rapids and that they robbed the victim after learning the victim had money. Because defendant told Harwood that he was involved in a murder that happened in Grand Rapids after he testified pursuant to an investigative subpoena, which was issued in the 2014 investigation into Battaglia's murder, and was charged and arrested for perjury, a reasonable inference that could be made was that defendant, in speaking to Harwood, was talking about Battaglia's murder. See *People v Harrison*, 283 Mich App 374, 378; 768 NW2d 98 (2009) (stating that all conflicts in the evidence must be resolved in favor of the prosecution).

-2-

The record discloses that the state presented evidence at trial that defendant assaulted Battaglia. Acey testified that he saw Jeffries, as well as defendant, hit a white guy on Lake Drive. Sheila testified that the day after she saw "them" fighting across the street from her house, defendant came up to her at the Holiday Inn where they both worked and said that he had been in her neighborhood and had beat and robbed a "white boy." Clarassa Polite, the daughter of Patricia Polite, defendant's girlfriend in 1990, testified that one night defendant came to Patricia's house and he was covered with blood. Patricia testified that defendant told her one night that he beat up a "white boy." Harwood testified that defendant said that he and his brother, after learning the victim had money, decided to rob the victim. Dr. Stephen Cohle, a forensic pathologist, testified that Battaglia was hit at least five times in the face and at least one time in the back of the head. The blow to the back of Battaglia's head caused a depressed skull fracture, and Dr. Cohle opined that the force necessary to create the fracture was that of a full-grown person swinging a baseball bat, or a similar item, very hard. Viewing this evidence in a light most favorable to the prosecution, which creates an inference that defendant and another person beat Battaglia after they agreed to rob him, a rational trier of fact could have found beyond a reasonable doubt that defendant acted with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result. *Cline*, 276 Mich App at 642.

Defendant also claims that there was insufficient evidence for the jury to find that Battaglia was killed during the commission of a robbery because there was no evidence of a felonious taking of property from Battaglia. In 1990, the unarmed robbery statute provided: "Any person who shall, by force and violence, or by assault or putting in fear, feloniously rob, steal and take from the person of another, or in his presence, any money or other property which may be the subject of larceny, such robber not being armed with a dangerous weapon, shall be guilty of a felony . . . ." MCL 750.530. The elements of unarmed robbery were "(1) a felonious taking of property from another, (2) by force or violence or assault or putting in fear, and (3) being unarmed." *People v Johnson*, 206 Mich App 122, 125-126; 520 NW2d 672 (1994).

Ted Villaire, Battaglia's roommate in 1990, testified that Battaglia carried a wallet; it was a black leather, two-fold wallet. Villaire also believed that Battaglia wore a watch. On June 10, 1990, Battaglia went to Mulligan's Pub. There was testimony that Battaglia was "rather tipsy." Officer Roland Sherman, the first officer to arrive at 1065 Lake Drive, testified that he looked for a wallet on Battaglia, but he did not find one. Similarly, Officer Brian Reed testified that at the autopsy he received Battaglia's clothing and the other possessions that were found on Battaglia. The possessions did not include a wallet or any identification. Battaglia's father testified that he was not given a wallet when he collected Battaglia's belongings from Battaglia's apartment. Additionally, Dr. Cohle testified that Battaglia had a "pale band" above his left wrist, and it was clear that Battaglia wore a watch or some other item there. A watch was not included in the possessions that Officer Reed received at the autopsy. Furthermore, Sheila testified that defendant told her at the Holiday Inn that he beat and robbed a white boy. Harwood testified that defendant said he and his brother were involved in a murder in Grand Rapids and that they robbed the victim.

Neither of the eyewitnesses to the assault, Acey and Sheila, testified that they saw defendant take anything from the man who was assaulted. Additionally, $29 was found in one of Battaglia's front pockets. However, circumstantial evidence and reasonable inferences may be

sufficient to establish the elements of a crime. *Dunigan*, 299 Mich App at 582. When the evidence is viewed in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that there was a felonious taking of property from Battaglia. *Cline*, 276 Mich App at 642.

We also reject defendant's argument that the evidence was insufficient for the jury to find that he intended the robbery when he assaulted Battaglia. "The felony-murder doctrine does not apply if the intent to steal the victim's property was not formed until after the homicide." *People v Orlewicz*, 293 Mich App 96, 110; 809 NW2d 194 (2011). For felony murder, the defendant must have intended to commit the underlying felony when the homicide occurred. *Id.* Evidence of drug use may be proof of motive. See *People v Jones*, 119 Mich App 164, 168; 326 NW2d 411 (1982). There was evidence that defendant used and was addicted to crack cocaine in 1990. Harwood testified that robberies were not uncommon for drug addicts. He was a former addict, and he had robbed people to get money for drugs. Harwood also testified that defendant said that he and his brother decided to rob the victim when they found out that the victim had money. Viewing this evidence in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that defendant intended the robbery when Battaglia was assaulted. *Cline*, 276 Mich App at 642.

Next, defendant argues that the trial court erred in admitting evidence that he beat Clarassa with an extension cord, and that he was charged with perjury after he testified pursuant to an investigative subpoena, and that he used crack cocaine. We review a trial court's evidentiary decisions for an abuse of discretion. *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id.* at 217.

MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

Three requirements must be met for other-acts evidence to be admissible. *People v Knox*, 469 Mich 502, 509; 674 NW2d 366 (2004). First, the evidence must be offered for a proper purpose, which is any purpose other than to show the defendant's action and conformity therewith. *People v Steele*, 283 Mich App 472, 479; 769 NW2d 256 (2009). Second, the evidence must be relevant under MRE 402 to an issue of fact that is of consequence at trial. *Knox*, 469 Mich at 509; *Steele*, 283 Mich App at 479. Third, under MRE 403, the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *Steele*, 283 Mich App at 479.

When Clarassa testified pursuant to an investigate subpoena in 2014, she informed the prosecutor that she had committed perjury in an unrelated case when she was 10 years old. The prosecutor argued to the trial court that the jury, in order to properly weigh Clarassa's testimony,

needed to know that she had previously committed perjury and why she had done so. According to Clarassa, she had committed perjury because defendant beat her with an extension cord in order to get her to lie. The trial court agreed with the prosecutor that the jury needed to know that she had previously lied under oath.

Clarassa's act of perjury was a specific instance of conduct. Thus, on cross-examination of Clarassa, defendant was allowed to inquire into her act of perjury. See MRE 608. However, at the hearing on the prosecutor's motion in limine, defendant stated that he had no intention of cross-examining Clarassa about her act of perjury.

Due process requires a prosecutor to disclose to the defense evidence that is material to the accused's guilt or punishment. *People v Chenault*, 495 Mich 142, 149; 845 NW2d 731 (2014). Due process also requires a prosecutor to inform the defendant and the trial court when a witness lies under oath. *People v Lester*, 232 Mich App 262, 276; 591 NW2d 267 (1998), overruled on other grounds *People v Chenault*, 495 Mich 142 (2014). A prosecutor may not knowingly use false testimony to obtain a conviction, and has a duty to correct false evidence. *Id.* Though we are not aware of any legal authority that requires a prosecutor to inform the jury that a witness committed perjury in an unrelated case, the prosecutor's duty to ensure that defendant receives a fair trial dictates that a prosecutor should disclose such evidence. See, generally, *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996).

It is improper to allow the prosecutor to attack the credibility of her own witness so that she can subsequently present otherwise inadmissible testimony to bolster the witness's credibility. *People v Smith*, 158 Mich App 220, 227; 405 NW2d 156 (1987). In this case, the record makes clear that the prosecutor had no reason to admit evidence of Clarassa's act of perjury other than to rehabilitate her credibility, which was done by introducing evidence that defendant assaulted Clarassa with an extension cord. Further, the prosecutor had no reason to attack her credibility. Clarassa was not a hostile witness. In fact, she gave testimony that supported defendant's involvement in Battaglia's murder. Additionally, because defendant stated that he had no intention of questioning her about her act of perjury, the prosecutor's questions to Clarassa about committing perjury cannot be characterized as a preemptive measure. Because the prosecutor attacked the credibility of Clarassa so that she could subsequently present evidence of defendant's assault with an extension cord, we conclude that the trial court abused its discretion in admitting evidence of defendant's assault of Clarassa. *Unger*, 278 Mich App at 216.

Next we turn to whether introduction of the evidence constituted error which requires or necessitates that defendant receive a new trial. We begin our analysis by noting that the erroneous admission of evidence is a nonconstitutional error. *People v Whittaker*, 465 Mich 422, 426; 635 NW2d 687 (2001). A preserved nonconstitutional error is not a ground for reversal unless, after an examination of the entire cause, it affirmatively appears more probable than not that the error was outcome determinative. *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999). A court must evaluate the effect of the error by assessing it in the context of the untainted evidence. *Id.* at 495.

As noted, at trial, defendant argued that the State failed to prove beyond a reasonable doubt that he was involved in Battaglia's murder. However, our review of the record indicates

the State produced sufficient evidence from which a jury could find beyond a reasonable doubt that defendant killed Battaglia. Sheila testified that in the early morning hours of June 11, 1990, she looked out her bedroom window after she heard some fighting. She saw "them" fighting across the street from her house. After hearing two loud smacks, she saw one person run and get into the front passenger seat of a car. When the person got into the car, Sheila saw that it was defendant. The following day at work, defendant approached Sheila and told her that he had been in her neighborhood and that he had robbed and beat a white boy. Acey testified that he saw defendant and Jeffries beat up a white guy on Lake Drive in 1990. After the white guy fell to the ground, defendant and Jeffries ran to and got into Acey's car. Admittedly, the credibility of both witnesses was an issue for the jury to determine. During the initial investigation in 1990, Sheila told police that she did not see anything the night Battaglia was killed. Acey made numerous statements to the police about who was involved in Battaglia's murder. Additionally, in 2014, it was not until after Sheila and Acey were charged with perjury that they told police that defendant was involved in Battaglia's murder. Nonetheless, Sheila and Acey corroborated one another and additional testimony from other witnesses suggested that defendant was involved in a murder in 1990. For example, Patricia testified that defendant told her that he beat up a white boy, and Clarassa testified that defendant came home one night and was covered in blood. Harwood testified that defendant said he and his brother were involved in a murder in Grand Rapids. While the record reveals there were numerous inconsistencies and contradictions in the testimony of these five witnesses, two witnesses placed defendant on Lake Drive when Battaglia was murdered, and testimony from others also indicated that defendant was involved in an assault or murder. Additional testimony revealed that defendant tried to get Acey's girlfriend, Brenda Thompson, to lie to the police during the 2014 investigation. Such actions can be construed as consciousness of guilt, see *People v Mock*, 108 Mich App 384, 389; 310 NW2d 390 (1981). Accordingly, following our examination of the entire record, it does not affirmatively appear more probable than not that the erroneous admission of evidence of defendant's assault of Clarassa was outcome determinative. *Lukity*, 460 Mich at 495-496.

Next, defendant argues that the trial court erred in admitting evidence that he was charged with perjury after he testified pursuant to an investigative subpoena because he never testified at trial and placed his credibility at issue. However, in making this argument, defendant does not address the basis of the trial court's ruling admitting the evidence, which was that the evidence was necessary to allow the jury to understand the context in which defendant made incriminating statements to Harwood. Defendant has left it to this Court to discover and rationalize why the trial court's ruling may have been an abuse of discretion. *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Hence, because defendant does not dispute the basis of the trial court's ruling, we do not consider granting defendant relief on this claim of error. See *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 381; 689 NW2d 145 (2004).

Defendant next argues that the trial court erred in admitting evidence that he used crack cocaine because there was no evidence that he was addicted to the drug. Motive is a proper purpose for the admission of other-acts evidence, MRE 404(b)(1), and drug use may be relevant and admissible as proof of motive. *Jones*, 119 Mich App at 168. Because evidence of drug use has a strong prejudicial effect, the relevance of drug addiction to motive for a theft offense is dependent on two factors: (1) the defendant was addicted at or near the time of the offense and, therefore, was compelled to obtain the drug and (2) the defendant lacked sufficient income from

legal sources to sustain his or her need for the drug. *Id.* Without such a foundation, evidence of drug use should be excluded as proof of motive because its probative value is substantially outweighed by its prejudicial effect. *Id.* at 168-169.

Contrary to defendant's argument, there was evidence that defendant was addicted to crack cocaine. Clarassa testified that when she lived on Wealthy Street, she learned that Patricia and defendant were crackheads. More specifically, Patricia testified that in June 1990 both she and defendant used crack cocaine and both were addicts. Accordingly, we reject defendant's argument that the trial court abused its discretion in admitting evidence of his use of crack cocaine. *Unger*, 278 Mich App at 216.[1]

Defendant also argues that Patricia's testimony that defendant told her that he hit a white boy who called him a "Black Nigger" was improper other-acts evidence because there was no connection between defendant's statement to Patricia and Battaglia's death. Defendant similarly argues that Harwood's testimony that defendant said he was involved in a murder in Grand Rapids that resulted from a drug transaction was improper other-acts evidence because no controlled substance was found in Battaglia's body. Because defendant did not object to this testimony from Patricia and Harwood, the claim of error is unpreserved, *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001), and reviewed for plain error affecting defendant's substantial rights, *People v Benton*, 294 Mich App 191, 202; 817 NW2d 599 (2011).

"MRE 404(b) only applies to evidence of crimes, wrongs, or acts 'other' than the 'conduct at issue in the case' that risks an impermissible character-to-conduct inference. Correspondingly, acts comprised by or directly evidencing the 'conduct at issue' are not subject to scrutiny under MRE 404(b)." *People v Jackson*, 498 Mich 246, 262; 869 NW2d 259 (2015). Defendant's argument that Patricia and Harwood testified to "other" acts of defendant is without merit. It was the prosecutor's theory that defendant, in telling Patricia that he beat a white guy and in telling Harwood that he was involved in a murder that was supposed to have been nothing more than a robbery of someone who wanted to buy marijuana, was referring to the murder of Battaglia. There was never any claim by the prosecutor that defendant beat or murdered someone other than Battaglia. Accordingly, there was no plain error. *Benton*, 294 Mich App at 202.

Additionally, defendant argues that the trial court erred in allowing the jury to hear numerous pieces of other-acts evidence that established his violent character. Because defendant did not object to any of this evidence on the basis of MRE 404(b), the claim of error is unpreserved, *Aldrich*, 246 Mich App at 113, and reviewed for plain error affecting defendant's substantial rights, *Benton*, 294 Mich App at 202. Defendant, by only listing the pieces of evidence that he claims were improper and by not providing any argument specific to those pieces of evidence, except for Clarassa's testimony that she and her siblings were not allowed to use the bathroom, has abandoned this argument. See *Kelly*, 231 Mich App at 640-641. Even if Clarassa's testimony that she and her siblings were not allowed to use the bathroom was plainly

---

[1] Defendant does not challenge whether there was evidence that he lacked sufficient income from legal sources to sustain his addiction.

erroneous, it did not affect defendant's substantial rights. *Benton*, 294 Mich App at 202. Because the testimony was brief, and because the testimony of Acey and Sheila that defendant was involved in the death of a person on Lake Drive was supported by testimony from Clarassa and Patricia, as well as from Harwood, the evidence did not affect the outcome of trial. See, generally, *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

Defendant next argues that the trial court, through its deadlocked jury instructions, coerced the jury into reaching a verdict. However, because defendant expressed satisfaction with the trial court's instructions after the jury announced that it was deadlocked, defendant waived any objection to the instructions, and there is no alleged error for this Court to review. *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011).

Defendant next argues that he was denied effective assistance of counsel. Because defendant did not move the trial court for a new trial or an evidentiary hearing, our review of defendant's claims of ineffective assistance of counsel is limited to mistakes apparent from the record. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). To establish a claim for ineffective assistance of counsel, a defendant must show that counsel's performance fell below objective standards of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceedings would have been different. *People v Uphaus (On Remand)*, 278 Mich App 174, 185; 748 NW2d 899 (2008).

First, defendant argues that defense counsel was ineffective because counsel did not object to the other-acts evidence. However, defense counsel objected to the admission of evidence that defendant assaulted Clarassa with an extension cord, that defendant was charged with perjury after he testified pursuant to an investigative subpoena, and that defendant used crack cocaine at the hearing on the prosecutor's motion in limine. Accordingly, defendant's claim that defense counsel failed to object to that other-acts evidence is without merit. Additionally, defense counsel was not ineffective for failing to object to Patricia's testimony that defendant told her he hit a white boy who called him a "Black Nigger" and Harwood's testimony that defendant said he was involved in a murder in Grand Rapids that resulted from a drug transaction. As previously discussed, this testimony was not subject to MRE 404(b) because it did not concern "other" acts by defendant. See *Jackson*, 498 Mich at 262. Any objection to the testimony would have been meritless, and counsel is not required to make a futile objection. *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998). Defendant has not provided any specific arguments relating to the alleged improper other-acts evidence showing his violent character and has thus abandoned the claim that defense counsel was ineffective for failing to object to the evidence. *Kelly*, 231 Mich App at 640-641.[2]

---

[2] Even if Clarassa's testimony that she and her siblings were not allowed to use the bathroom was improper other-acts evidence and defense counsel's failure to object to it based on MRE 404(b) fell below objective standards of reasonableness, we find there is no reasonable probability that, but for defense counsel's deficient performance, the result of defendant's trial would have been different. *Uphaus (On Remand)*, 278 Mich App at 185.

Second, defendant argues that defense counsel was ineffective for failing to object to the trial court's deadlocked instructions. In *People v Sullivan*, 392 Mich 324, 342; 220 NW2d 441 (1974), the Supreme Court adopted ABA standard jury instruction 5.4 as the appropriate instruction to give to a deadlocked jury. Any substantial departure from the instruction was a ground for reversal. *Id.* An instruction substantially departs from the ABA standard jury instruction when it has "an undue tendency of coercion." *People v Hardin*, 421 Mich 296, 314; 365 NW2d 101 (1984).[3] The relevant inquiry is whether the instruction given could "cause a juror to abandon his conscientious dissent and defer to the majority solely for the sake of reaching agreement." *Id.* This Court looks to the language of the instruction to see if the instruction contained any "pressure, threats, embarrassing assertions, or other wording" that would cause coercion. *Id.* at 315 (quotation marks and citation omitted). This Court also looks to whether the trial court required, or threatened to require, the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

Defendant claims that the trial court's deadlocked instructions were unduly coercive because the trial court stated that, if the jury did not reach a decision, another jury would have to make a decision after rehearing the same testimony. Not every deadlocked instruction that mentions the need for a subsequent trial if a jury is unable to reach a verdict is unduly coercive. See *People v Rouse*, 272 Mich App 665, 676-677; 728 NW2d 874 (2006) (JANSEN, J., dissenting), dissenting opinion adopted in *People v Rouse*, 477 Mich 1063 (2007). In the present case, after the jury announced that it was deadlocked, for reasons not stated on the record, the trial court did not use M Crim JI 3.12 to instruct the jury. However, following closing instructions, the jury had been instructed, in part, that "[a]ny verdict must represent the individual considered judgment of each juror" and "none of you should give up your honest opinion about this case just because other jurors disagree with you or for the sake of reaching a verdict. In the end your vote must be your own and you must vote honestly and in good conscious." In its deadlocked instructions, the trial court referenced the previous instructions it had given. Additionally, in its deadlocked instructions, the trial court did not state that the jury's failure to reach a verdict would be a failure in purpose, nor did the trial court indicate that the jury's failure to reach a verdict would have a compromising or detrimental effect on the current justice system. Compare *People v Goldsmith*, 411 Mich 555, 560-561; 309 NW2d 182 (1981). Furthermore, the trial court did not require, or threaten to require, the jury to deliberate for an unreasonable length of time or for unreasonable intervals. *Hardin*, 421 Mich at 316. Before the jury announced that it was deadlocked, it had deliberated for no more than six hours, and the trial court only requested that it deliberate for another hour. And the trial court promised that, once the jury had deliberated for another hour, it would call the jury into the courtroom and "we'll see where we go from there." This last statement by the trial court, along with the trial court's statement to the jury that "if you don't [reach a verdict], you don't," indicates that the jury's failure to reach a verdict was an acceptable result. Reading the deadlocked instructions as a

---

[3] The ABA standard jury instruction has been adopted in the Michigan standard criminal jury instructions. See *People v Pollick*, 448 Mich 376, 382 n 12; 531 NW2d 159 (1995); M Crim JI 3.11; M Crim JI 3.12. We strongly advise that trial courts use standard jury instructions whenever possible.

whole, *People v Kurr*, 253 Mich App 317, 327; 654 NW2d 651 (2002), the trial court's inclusion of a statement regarding the necessity of another jury if the jury did not reach a verdict would not have a tendency to cause a juror to abandon his or her conscientious dissent and defer to the majority solely to reach an agreement. *Hardin*, 421 Mich at 314.

Defendant also argues that the trial court's deadlocked instructions were unduly coercive because the trial court made the foreperson stand and then chastised him. According to defendant, the trial court clearly indicated that the foreperson was not exerting enough pressure on the jurors in the minority to coerce them into changing their minds. After the trial court had the foreperson stand and asked him whether the jury could have additional honest discussions, the trial court had the foreperson sit down. Again, for reasons unclear from the record, the trial court then instructed the jury that it needed to discuss the case further and that "[i]f your foreperson is not leading discussions in a proper way," it may need to elect another foreperson. But the trial court stated that it was not telling the jury that it "ha[d] to do one thing or the other." Thus, the trial court only suggested the possibility that, in order for the jury to engage in further productive and honest discussions, the jury could select a new foreperson. Though somewhat inexplicable as to their intent, the trial court's statements cannot be viewed as a chastisement that the foreperson failed to and should exert pressure on jurors who were in the minority.

Additionally, defendant asserts that the trial court's statement that it was "shocked" at the jury's note that it was deadlocked and that it had been involved in many trials where the jury deliberated for two, three, or four days implied that the jury was not trying hard enough and was not properly performing its civic duty. While we agree that an implication from the trial court's statement could be that the jury had not tried hard enough and had given up too soon, the statement cannot be viewed as unduly coercive. Following its "shocked" statement, the trial court indicated that the jury's failure to reach a verdict was an acceptable result. The trial court not only told the jury that "if you don't [reach a verdict], you don't" and that, after the jury deliberated for an hour, it would call the jury back to the courtroom and "we'll see where we go from there." In light of the trial court's subsequent statements, we cannot find that the trial court's admonishment that it was "shocked" would cause a juror to abandon his or her conscientious dissent and defer to the majority solely for the sake of reaching agreement. *Hardin*, 421 Mich at 314.

Defendant further argues that the fact that the jury rendered a verdict within an hour, after the trial court asked it to deliberate for at least another hour circumstantially proved that the trial court's instructions were coercive. Caselaw from this Court indicates that a deadlocked instruction has no coercive effect when the jury, after receiving the instruction, engages in lengthy discussions. See, e.g., *People v Bookout*, 111 Mich App 399, 403-404; 314 NW2d 637 (1981). However, because we must initially look to the language of the deadlocked instruction to determine whether it was unduly coercive, see *Hardin*, 421 Mich at 314, and because the language of the trial court's instructions as a whole were not unduly coercive, we decline to hold that the amount of time spent by the jury following the deadlocked instruction is determinative of whether the jury was unduly coerced. Accordingly, we cannot conclude that defense counsel was ineffective for failing to object to the deadlocked instructions. Even if we were to so conclude, for the reasons stated above, we cannot conclude that counsel's failure to object affected the result or the nature of the proceedings in such a way as to cause this Court to order a new trial. *Uphaus (On Remand)*, 278 Mich App at 185.

-10-

Affirmed.

/s/ Stephen L. Borrello
/s/ Kurtis T. Wilder
/s/ Brock A. Swartzle