*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
December 17, 2020

Plaintiff-Appellee,

v

No. 339803
Wayne Circuit Court
LC No. 16-009446-01-FC

DOMINIC CORTEZ DECARLO,

Defendant-Appellant.

Before: CAVANAGH, P.J., and JANSEN and SHAPIRO, JJ.

PER CURIAM.

Defendant appeals as of right his jury convictions of assault with intent to murder, MCL 750.82, carrying a dangerous weapon with unlawful intent, MCL 750.226, felon in possession of a firearm, MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), second offense, MCL 750.227(b). We affirm.

On June 26, 2016, defendant shot an acquaintance, DeAnte Sullivan, three times. Sullivan testified that when defendant visited him for a brief time earlier in the day at the home of a mutual friend, defendant was acting strangely in that he was unusually agitated, searching through drawers, asking for money, and searching the home for items he could sell. After defendant left, Sullivan took a firearm from the table and put it in his waistband, thinking that he was going to be robbed. Sullivan testified that he was standing on the porch when defendant returned a short time later and stated, "You know what time it is"—meaning that he was going to rob Sullivan. When Sullivan asked if he was serious, defendant pulled a handgun out of his pocket and pointed it at Sullivan's chest. Sullivan recalled that defendant shot him in the chest as he pulled his own firearm from the holster in his waistband. Sullivan said that he fled while shooting at defendant, and was struck two times in the back as he fled. Sullivan was found by the police more than a block away and was transported to the hospital. While at the hospital, Sullivan identified defendant as his assailant, and defendant was arrested.

-1-

## I.  INEFFECTIVE ASSISTANCE OF COUNSEL

On appeal, defendant first argues that his trial counsel provided ineffective assistance in cross-examining Sullivan and a cell phone expert.  Previously, this Court remanded this case to the trial court, in part for a hearing on defendant's claim that his trial counsel failed to call an alibi witness.[1]  Defendant did not raise the cross-examination issues as a basis for his claim of ineffective assistance in his motion for remand or in a motion for new trial brought in the trial court.  Thus, this issue has not been properly preserved.  Claims of ineffective assistance of counsel that are unpreserved are limited to review for errors apparent on the record.  *People v Unger* (*On Remand*), 278 Mich App 210, 253; 749 NW2d 272 (2008).  The constitutional question of whether an attorney's ineffective assistance deprived a defendant of his Sixth Amendment, US Const, Am VI, right to counsel is reviewed de novo.  *Id.* at 242.

A defendant's right to counsel is guaranteed by the United States and Michigan Constitutions.  US Const, Am VI; Const 1963 art 1, § 20.  This "right to counsel encompasses the right to the 'effective' assistance of counsel."  *People v Cline*, 276 Mich App 634, 637; 741 NW2d 563 (2007).  To establish an ineffective assistance of counsel claim, a defendant must show not only that his counsel's performance was deficient, but also that it prejudiced the defense.  *People v Taylor*, 275 Mich App 177, 186; 737 NW2d 790 (2007) (citation omitted).  A counsel's performance is deficient if "it fell below an objective standard of professional reasonableness."  *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007).  The performance will be deemed to have prejudiced the defense if "it is reasonably probable that, but for counsel's ineffective assistance, the result of the proceeding would have been different."  *Id.*  "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise."  *People v Rodgers*, 248 Mich App 702, 714; 645 NW2d 294 (2001).

With regard to the cross-examination of the cell phone expert, Stan Brue, defendant argues that it was too long, unfocused, and without purpose, and also that it did not illuminate the science behind the cell phone data.  However, the record reveals extensive questioning about how Brue collected and interpreted the data.  Trial counsel began by asking Brue about the process of collecting and analyzing the data, and about the limits of certainty of Brue's knowledge about what happened with the movements of the phone.  Trial counsel had Brue detail the calls that came in, confirming that the phone was in continuous use before the time of the crime.  Counsel asked about the radius of cell tower coverage and changing variables that influence the area of a phone tower sector, and about the large amount of information generated from a cell phone account.  Defendant asserts that the cross-examination "irritated the judge and tried the patience of the jury" because of irrelevant questions.  The trial court interrupted trial counsel's questioning several times to ask about its relevance or to move the questioning along.  Some of the questioning that was related to very specific aspects of Brue's work may have been pedantic, and not always directly related to Brue's testimony identifying the activity of defendant's cell phone near the area of the crime.  However, the questioning appears to have elicited testimony that was helpful to defendant.  Trial counsel highlighted that law enforcement did not have access to GPS (global positioning systems)

---

[1] *People v DeCarlo*, unpublished order of the Court of Appeals, entered September 7, 2018 (Docket No. 339803).

data to precisely track defendant's phone. Also, Brue acknowledged that there was a failure rate of cell phone data to map a sector, and a possibility of calls made from outside a sector showing as if they were made in a sector. Further, counsel established that Brue did not know the home sector of defendant's phone or whether it previously had been in the area of the crime. Trial counsel also elicited the fact that cell phone data does not identify who was in possession of a phone, and that the data could not definitively establish that the phone was at the scene of the crime, but only that the data was consistent with the phone being in the sector.

Most significantly, trial counsel relied on the information that was elicited on cross-examination to argue in closing that there was a reasonable doubt regarding defendant's guilt. In closing, trial counsel questioned what Brue's testimony had proven if he could not say who possessed the phone, who purchased the phone, or whether the phone previously had been in the area of the crime because all of the records were purposefully not examined. Trial counsel noted that Brue only tracked an hour of defendant's cell phone use, rather than the entire day, and that the cell phone testimony did not coincide with Sullivan's report that defendant left the area for 45 minutes before returning and shooting at Sullivan. Counsel highlighted that the data could not place the phone at a precise location, but only within a larger sector. Also, trial counsel noted that Sullivan did not mention defendant using his cell phone, but that Brue's testimony indicated that several calls were made in the sector at the time the shooting was supposed to have occurred.

"The questioning of witnesses is presumed to be a matter of trial strategy." *People v Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008). Defendant argues that the extensive questioning of Brue only highlighted the importance of his testimony. However, after remand, at a hearing on defendant's motion for a new trial, counsel testified about his strategy with regard to Brue's testimony. He said that he was familiar with Brue, from cross-examining him in a previous trial, and had consulted with an expert who had previously testified in opposition to Brue in a federal case. He also filed a motion to suppress the cell phone records based on the assertion of an unlawful search and requested a stay, which was denied, to appeal the trial court's denial of his motion to suppress. He strategized that challenging the cell phone evidence was critical because he thought the credibility of Sullivan's testimony could be successfully challenged. Thus, the strategy emphasized the importance of discounting Brue's testimony as it was one of two main streams of incriminating evidence.

It appears that defendant's trial counsel was prepared to cross-examine Brue, and eager to challenge his testimony. Defendant does not argue that his trial counsel failed to attack any aspect of Brue's testimony. Even though it became drawn out and involved minor details about Brue's work, the breadth of trial counsel's questions to Brue reflect an effort to elicit testimony that counsel was going to rely on in closing argument to attack Brue's testimony. Namely, defendant's trial counsel wanted to discount Brue's testimony that defendant's cell phone was in the area at the time of the crime by highlighting any imprecision in both the scope of Brue's investigation and the accuracy of the data. "A failed strategy does not constitute deficient performance." *Petri*, 279 Mich App at 412. "This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999). In this case, defendant has failed to establish that the performance of his trial counsel was deficient with respect to counsel's cross-examination of Brue because he was employing a reasonable trial strategy.

Defendant also argues that his trial counsel was ineffective in his cross-examination of Sullivan; he asserts that irrelevant and repetitive questioning did not expose any inconsistencies. He references Sullivan's preliminary examination testimony. However, with the preliminary examination testimony trial counsel successfully demonstrated that Sullivan's trial testimony—that defendant shot him during defendant's second visit—was different than his preliminary examination testimony that he shot him on a third visit. Trial counsel explained that, although cumulative, testimony was elicited to lay a foundation and provide context for the impeachment testimony. Defendant also notes that the trial court had to ask counsel to move along a few times during Sullivan's testimony when counsel was asking Sullivan to elaborate on his escape from defendant. However, Sullivan's description of the route he took to escape defendant, and when he shot at defendant, evolved from general to specific during his testimony.

Defendant argues that the lack of a proper cross-examination denied him a defense. He specifically argues that the cross-examination failed to inform the jury that there was no evidence establishing that robbery was a motivation for the shooting. However, trial counsel's questions to Sullivan revealed that defendant did not ask for money when he confronted Sullivan on his second visit, and that nothing was taken from Sullivan throughout the incident. Cross-examination also introduced a possibly related incident—defendant had been involved in an auto accident in the same area of the shooting on the previous day and Sullivan witnessed the accident. Additionally, trial counsel's questioning informed the jury that Sullivan's report about the timing of events varied. Cross-examination clarified that Sullivan was standing on the porch when defendant returned, and was within five feet when defendant shot him from a location in front of the porch. Finally, trial counsel had Sullivan describe how he gave a statement to hospital workers that was inconsistent with his testimony, and that he initially lied to the police by telling them that he did not have a gun.

At the hearing on remand, trial counsel testified that, after the preliminary examination, he thought that Sullivan was an evasive witness whom he could effectively cross-examine. Counsel also stated that he and his investigator visited the scene of the shooting. Trial counsel's closing argument demonstrated that the strategy was to discredit Sullivan with the evidence that counsel elicited. Counsel argued that Sullivan's testimony was not credible. Counsel highlighted the uncertainty of Sullivan's testimony given that he told the hospital a different story of how he had been shot, and gave conflicting testimony about the timing of the visits and the number of times that defendant had visited Sullivan. Counsel noted that Sullivan said that he shot at defendant, but no shell casings were found, and that Sullivan gave an uncertain account of the path he took while eluding defendant. He noted that shells were found in the street, rather than in the grass in front of the stairs where Sullivan said that defendant approached him, and argued that the evidence for robbery as a motive was weak because it was limited to defendant stating, "you know what time it is."

"Counsel may provide ineffective assistance if counsel unreasonably fails to develop the defendant's defenses by adequately impeaching the witnesses against the defendant." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014). In this case, defendant's trial counsel employed a reasonable strategy of attempting to discredit the complainant. He asked questions of Sullivan during cross-examination that produced testimony that could be used to argue in closing that Sullivan was not credible. Defendant does not identify any of Sullivan's testimony that trial counsel failed to attempt to discredit. That some of the questions became repetitive and

increasingly detailed does not establish deficient performance. Thus, defendant has not established that the performance of his trial counsel was deficient in failing to challenge the complainant's credibility during cross-examination; challenging his credibility was a reasonable defense strategy that was appropriately executed.

## II. PROSECUTOR MISCONDUCT

Defendant next argues that the prosecutor made an impermissible comment in closing argument. Defendant preserved this issue by objecting, *People v Solloway*, 316 Mich App 174, 201; 891 NW2d 255 (2016), therefore our review is de novo, *People v Abraham*, 256 Mich App 265, 272; 662 NW2d 836 (2003).

The prosecutor has a duty to ensure that the defendant receives a fair trial. *People v Farrar*, 36 Mich App 294, 299; 193 NW2d 363 (1971). The responsibility of a prosecutor is to seek justice, rather than merely to convict. *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "[T]he test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *Id*. A fair trial "can be jeopardized when the prosecutor interjects issues broader than the defendant's guilt or innocence." *Id*. at 63-64.

In rebuttal closing argument, the prosecutor stated: "Send a message to that guy." Defendant objected and, before the trial judge responded, the prosecutor clarified: "That's incorrect. Send a message to this defendant. There's nothing objectionable about that. That his behavior, that this shameless behavior is completely unacceptable. Thank you."

Improper comments by a prosecutor unfairly introduce an issue that "encourages jurors not to make reasoned judgments." *Abraham*, 256 Mich App at 273. A prosecutor may not appeal to the jury to sympathize with the victim, *People v Watson*, 245 Mich App 572, 591; 629 NW2d 411 (2001), or ask the jurors to convict based on their civic duty, *Abraham*, 256 Mich App at 273. However, prosecutorial comments must be read as a whole and evaluated in context, including the arguments of the defense and the relationship they bear to the evidence. *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004). Prosecutors have "great latitude regarding their arguments," and are "generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *Unger*, 278 Mich App at 236.

In this case, the prosecutor's remark was the last remark in rebuttal closing argument, and came after the prosecution had argued the evidence and defendant had responded. On rebuttal, the prosecutor responded to defendant's arguments that the evidence left a reasonable doubt as to defendant's guilt by summarizing the evidence and applying it to defendant's theory of the case, and then asserting the prosecutor's theory. The prosecutor then concluded: "Reasonable doubt. Commons sense, not hopes and dreams, not fantasy land, real life, real people. Send a message to that guy." Even though the specific comment did not state that it was based on the evidence—that the jury should send defendant a message based on the evidence—it was clear from the context of the remark that it was tied to the evidence of the charges and was in response to defendant's theory of the evidence. And the prosecutor quickly clarified that the message was that "his behavior, that this shameless behavior is completely unacceptable." Further, the trial court later instructed the jury that "the lawyers (sic) statements and arguments are not evidence." Instructions from the trial court to the jury may be "sufficient to eliminate any prejudice that might have resulted from the

prosecutor's remarks." *Thomas*, 260 Mich App at 454. "[J]urors are presumed to follow their instructions." *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). Thus, defendant has failed to establish that the prosecutor's remark denied him a fair trial.

## III. REASONABLENESS OF SEARCH

Defendant lastly argues that the trial court erred by denying defendant's motion to suppress the cell phone evidence based on an unreasonable search. Defendant's motion to suppress was denied, and this Court reviews de novo a trial court's ruling on a motion to suppress because of an unreasonable search. *People v Gingrich*, 307 Mich App 656, 661; 862 NW2d 432 (2014). The trial court's factual findings are reviewed for clear error, with deference to the trial court's findings. *Id*. A factual finding is clearly erroneous if it leaves the Court with a firm and definite conviction that a mistake was made. *Id*.

The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures and provides that no warrants shall issue without probable cause. US Const, Am IV. The Michigan constitutional provision is substantially the same. Const 1963, art 1, § 11. An individual has a reasonable expectation of privacy in the record of his physical movements recorded in cell phone location data records. *Carpenter v United States*, ___ US ___, ___; 138 S Ct 2206, 2217-2219; 201 L Ed 2d 507 (2018). In *Riley v California*, 573 US 373, 401-402; 134 S Ct 2473; 189 L Ed 2d 430 (2014), the Court concluded that, absent exceptional circumstances, the government must obtain a search warrant in order to examine the contents of an individual's phone.

In this case, defendant argued that the evidence gained as a result of search warrants executed on his phone and phone records should have been excluded from trial because the warrants were not properly based on probable cause and were overly broad. The exclusionary rule, with several exceptions, bars the introduction into evidence of materials seized and observations made during an unconstitutional search. *People v Hawkins*, 468 Mich 488, 498-499; 668 NW2d 602 (2003). Evidence subsequently obtained as the result of an unlawful search is to be excluded from evidence as "fruit of the poisonous tree." *People v Reese*, 281 Mich App 290, 295; 761 NW2d 405 (2008), citing *Wong Sun v United States*, 371 US 471, 487-488; 83 S Ct 407; 9 L Ed 2d 441 (1963).

Whether a search was lawful depends on whether it was reasonable. *People v Nguyen*, 305 Mich App 740, 751; 854 NW2d 223 (2014). "Whether a search is reasonable is a fact-intensive determination and must be measured by examining the totality of the circumstances." *People v Mullen*, 282 Mich App 14, 21; 762 NW2d 170 (2008). A search warrant may only be issued upon a showing of probable cause. US Const, Am IV; Const 1963, art 1, § 11; see also MCL 780.651(1). To find a substantial basis for probable cause, this Court "must ensure that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Mullen*, 282 Mich App at 22 (quotation marks and citation omitted). "When reviewing a search warrant affidavit, we must read it in a common sense and realistic manner, not a crabbed or hypertechnical manner." *Id*. at 27 (quotation marks and internal citation omitted).

In this case, the affiant completing the warrant application was the detective in charge of the Sullivan shooting investigation. The affiant attested that Sullivan had identified defendant as the person who shot him and that defendant had been arrested. The affiant also stated that

Sullivan's brother had reported that Sullivan had received a phone message telling him to delete a video from the previous day of defendant getting loaded into an ambulance because of an accident at the location where Sullivan was shot. The warrant request concluded:

> There is probable cause that shows Mr. Sullivan was shot by [defendant]. Through training and experience, affiant has learned that the individual suspected of committing crimes often use cell phones to coordinate their acts, discuss details, and take and send pictures. Often individuals also store personal data that will show ownership and have the abilities to access social media. Affiant believes that data obtained from the warrant will aid this investigation by providing evidence of the shooting.

An "affiant's experience is relevant to the establishment of probable cause." *People v Waclawski*, 286 Mich App 634, 698; 780 NW2d 321 (2009).

The search warrant application for defendant's phone records from Sprint contained identical language, except that the following was added to the final paragraph:

> Cell phones may also include [GPS] technology for determining the location of the device when used. Individuals use cell phone devices for communication through radio signals. The phone sends signals through networks of transmitters/receivers and the cell sectors may provide an area where calls were made and show a pattern of life. Individuals often store personal data and store identifying contact information for associates. A cell phone usually includes a "call log" which records the telephone numbers, date, and times of calls made to and from the phone. Affiant believes that data obtained from the warrant will aid this investigation by providing evidence of the shooting.

"A reviewing court must give great deference to a magistrate's finding of probable cause to issue a search warrant." *Mullen*, 282 Mich App at 21. The reviewing court evaluates "whether a reasonably cautious person could have concluded that there was a 'substantial basis' for the finding of probable cause." *Unger*, 278 Mich App at 243-244 (citation omitted). Evaluating the affidavits in a common sense and realistic manner, and deferring to the decision of the trial court, we conclude that "a reasonably cautious person could have concluded that there was a 'substantial basis' for [a] finding of probable cause," *id.*, that evidence of Sullivan's shooting would be found on defendant's telephone and in his telephone records. The affidavits set forth evidence that defendant shot Sullivan, that he was likely to have possessed and used his phone during the crime, and that it was possible that he had communicated with Sullivan about his accident the previous day in the same area of the shooting. Further, it was probable that the phone records would contain evidence of defendant's location at the time he shot Sullivan and of defendant's contacts with Sullivan or others related to the shooting.

Defendant argues that the warrant for his cell phone records was generalized and lacking in particularity because it allowed a search of three months of records. The search warrant sought "detailed account, billing, payment information as well as owner information" for defendant's phone, as well as "subscriber information, call detail records, cell site tower data and tower location, SMS data, MMS data, internet access history, per call measurement data, IP addresses

-7-

assigned with the dates and times assigned. All data requested is between the time periods of March 30th 2016 through June 30th 2016."

"A search warrant must particularly describe the place to be searched and the persons or things to be seized." *Unger*, 278 Mich App at 245. The specificity required depends on the circumstances involved and the type of items to be searched. *Id*. This particularity requirement "is to provide reasonable guidance to the executing officers and to prevent their exercise of undirected discretion in determining what is subject to seizure." *Id*. (quotation marks and citations omitted). It is "well settled that a search may not stand on a general warrant." *People v Hellstrom*, 264 Mich App 187, 192; 690 NW2d 293 (2004). But the warrant in this case did not allow a general search of defendant's cell phone records. The search was limited to three months of records, which turned out to be 19 days of records because defendant did not acquire the phone until June 11, 2016. The warrant specified the type of data sought in a specific time period. That the period extended beyond the day of the crime does not mean it was a general warrant because evidence of the crime could have been on the phone in the authorized period.

Defendant states that the three-month period extended too far beyond the time of the crime and was not likely to produce evidence related to the crime. However, in this case text conversations that defendant had on the phone over the months before the crime could help ascertain whether defendant had a motive for the crime, or a familiarity or ongoing dispute with Sullivan, and could have provided evidence of the planning of the crime. Location data from defendant's phone for the months prior to the crime could demonstrate whether defendant had been in that same area frequently, or whether the area was specifically targeted on the day of the crime. Therefore, the three-month period appears to be reasonable.

Even if the three-month period was overly broad, any defect in the warrant would not require the application of the exclusionary rule because the officer relied on the warrant in good faith. "The 'good-faith' exception renders evidence seized pursuant to an invalid search warrant admissible as substantive evidence in criminal proceedings where the police acted in reasonable reliance on a presumptively valid search warrant that was later declared invalid." *Hellstrom*, 264 Mich App at 193-194 (citations omitted). In this case, there is no argument that the officer failed to act in good faith in executing the warrant.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Kathleen Jansen
/s/ Douglas B. Shapiro