*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

MICHAEL PAUL PARNELL,

       Defendant-Appellant.

UNPUBLISHED
September 15, 2022

No. 357004
Muskegon Circuit Court
LC No. 02-047101-FH

_____

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

MICHAEL PAUL PARNELL,

       Defendant-Appellant.

No. 357005
Muskegon Circuit Court
LC No. 02-048012-FH

_____

Before: MURRAY, P.J., and O'BRIEN and REDFORD, JJ.

PER CURIAM.

In Docket No. 357004, defendant, Michael Paul Parnell, appeals as of right his sentences arising from his jury-trial convictions for fourth-degree criminal sexual conduct (CSC-IV) (sexual contact by force or coercion), MCL 750.520e(1)(b); resisting and obstructing a police officer, MCL 750.479(1)(b); and carrying a concealed weapon (CCW), MCL 750.227. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 10 to 15 years' imprisonment for the CSC-IV conviction, 2 to 15 years' imprisonment for the resisting-a-police-officer conviction, and life imprisonment for the CCW conviction. In Docket No. 357005, defendant appeals as of right his sentence arising from his jury-trial conviction of witness intimidation, MCL 750.122(8). The trial court sentenced defendant as a fourth-offense habitual offender to life imprisonment. Defendant's convictions in each docket were the result of separate

-1-

jury trials, but he was sentenced for all of his convictions at a single sentencing hearing. This Court consolidated the cases on appeal.[1] We now affirm in both dockets.

## I. BACKGROUND

Defendant's convictions in Docket No. 357004 arise from a sexual assault that occurred on February 13, 2002, in Muskegon, Michigan. Defendant, who was riding a bicycle, grabbed and squeezed the buttocks of the victim, KF, as she walked toward her car. KF called 911 and provided a description of defendant and his bike to the dispatcher. Following a foot chase and struggle, defendant was arrested and handcuffed. A subsequent search revealed that defendant was carrying a knife. A police officer also found that defendant had pantyhose with the legs cut off and tied together. The officer testified that he had seen pantyhose in that condition used as a mask. Following a two-day trial, the jury found defendant guilty of CSC-IV, resisting a police officer, and CCW.

Defendant's witness intimidation conviction in Docket No. 357005 arises from a previous armed robbery conviction. On February 4, 2002, defendant held 12-year-old CB at knifepoint in a Kmart bathroom stall and ordered her to remove her underwear. Defendant unzipped his pants, placed his groin onto CB's groin, and stuck his tongue down her throat. When he left, he took CB's underwear and threatened to kill her if she screamed or told anyone what had happened. CB testified about the incident at a trial held in June 2002, after which defendant was convicted of armed robbery, MCL 750.529, and sentenced as a fourth-offense habitual offender to 45 to 100 years' imprisonment. Defendant appealed that conviction,[2] and while his appeal was pending, CB received a letter in the mail at her home where she lived with her grandmother. The letter, which was addressed to CB and signed by defendant, contained graphic threats to rape, torture, and murder CB unless she recanted her testimony against defendant. The letter also contained graphic hand-drawn pictures. Three of defendant's fingerprints were discovered on the letter. On the basis of this letter, a jury convicted defendant of witness intimidation.

Defendant was sentenced for his convictions in Docket Nos. 357004 and 357005 at a single sentencing hearing. At the hearing, the trial court described defendant's lengthy criminal history, which included several assaults against young girls and women. The court found that defendant was "out of control," and that there were substantial and compelling reasons to exceed the sentencing guidelines. The court then sentenced defendant as previously described.

Defendant's initial appellate counsel failed to pursue an appeal, eventually leading to his appellate rights being restored in April 2021. Thereafter, defendant filed a motion to correct an

---

[1] *People v Parnell*, unpublished order of the Court of Appeals, entered May 4, 2021 (Docket Nos. 357004 and 357005).

[2] A panel of this Court eventually affirmed defendant's armed robbery conviction and sentence in an unpublished, per curiam opinion. *People v Parnell*, unpublished per curiam opinion of the Court of Appeals, issued July 29, 2004 (Docket No. 248236).

invalid sentence in which he raised the claims that he now raises in this appeal. The trial court denied that motion in a written opinion and order. This appeal followed.

## II. ANALYSIS

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant first argues that he was denied the effective assistance of counsel at sentencing because defense counsel failed to establish that defendant suffered from an intellectual disability. Defendant further argues that this showing would have prohibited the court from imposing life sentences on defendant. We disagree.

Generally, whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law—a trial court's factual findings are reviewed for clear error, while its constitutional rulings are reviewed de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002); *People v Cline*, 276 Mich App 634, 637; 741 NW2d 563 (2007). In this case, however, no evidentiary hearing was held, so the trial court never made factual findings, and our review is accordingly limited to mistakes apparent on the lower court record. See *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009).

To prevail on a claim of ineffective assistance of counsel, a defendant must establish that "(1) the performance of his counsel was below an objective standard of reasonableness under prevailing professional norms and (2) a reasonable probability exists that, in the absence of counsel's unprofessional errors, the outcome of the proceedings would have been different." *People v Sabin (On Second Remand)*, 242 Mich App 656, 659; 620 NW2d 19 (2000). "A defendant must overcome a strong presumption that the assistance of his counsel was sound trial strategy, and he must show that, but for counsel's error, the outcome of the trial would have been different." *Id*.

Defendant asserts that defense counsel was ineffective during sentencing for failing to present a social worker evaluation that was prepared in 1993 to show that defendant suffered from an intellectual disability. "[D]ecisions regarding what evidence to present and which witnesses to call are presumed to be matters of trial strategy, and we will not second-guess strategic decisions with the benefit of hindsight." *People v Dunigan*, 299 Mich App 579, 589-590; 831 NW2d 243 (2013).

We first conclude that defense counsel's decision to not present the social worker evaluation did not fall below an objective standard of reasonableness. The report was prepared in July 1993 when defendant was 15 years old, and defendant was sentenced in 2003 when he was 25 years old. Thus, the report was 10 years old at the time of his sentencing. Defendant has not presented any evidence that defense counsel was aware of this report or otherwise had reason to know that defendant suffered from an intellectual disability. This is particularly concerning given that defendant had an extensive history with the criminal justice system by the time he was sentenced for these offenses, and nothing in those cases suggests that defendant had—or in some way asserted that he may have—an intellectual disability. Defendant bears the burden of establishing the factual predicate of his claim, which in this case includes establishing that defense counsel knew or should have been known (1) about the 1993 report or (2) that defendant otherwise

may have an intellectual disability. See *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999) (explaining that a defendant "has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel").

Further, as pointed out by the trial court and the prosecution, the report contained the opinion of a therapist who believed that defendant had a poor prognosis for rehabilitation and would likely reoffend if released into the community—an opinion that proved accurate, as demonstrated by defendant's subsequent criminal history. Additionally, the report detailed defendant's juvenile adjudications for criminal sexual conduct, along with other offenses such as arson, theft, and fighting. Given this damaging information in the 1993 report, even if defense counsel was aware of the report in February 2003, counsel would have had to decide whether its potentially mitigating effects outweighed its possible prejudicial effects. On such facts, counsel's decision to not present the report would be a typical example of reasonable trial strategy, which this Court "will not second-guess" on appeal. See *Dunigan*, 299 Mich App at 589.[3]

Regardless, even if defendant could establish the first prong of his ineffective assistance claim, we would conclude that the claim fails because there is not a reasonable probability that, but for counsel's failure to present the 1993 report, the outcome of the proceedings would have been different. At the sentencing hearing, defendant stated that he reviewed the presentence investigation report and that he did not have any changes or additions. The report states that defendant completed the eighth grade and had received mental health treatment.[4] Thus, the lower court was aware that defendant possessed a limited education and possibly had a mental illness when it sentenced defendant, and we do not believe it reasonably probable that defendant's sentence would have been different had the trial court also reviewed the 1993 report.

Defendant argues more generally that, if the trial court had evidence of his intellectual disability, it would have been precluded from imposing life sentences. In support of this assertion, defendant relies on the United States Supreme Court's decision in *Atkins v Virginia*, 536 US 304, 318; 122 S Ct 2242; 153 L Ed 2d 335 (2002), in which the Court held that imposing capital punishment on a defendant with an intellectual disability violates the Eighth Amendment's prohibition of cruel and unusual punishment, US Const, Am VIII. The Court reasoned that

---

[3] On appeal, defendant contends that, on the basis of *Strickland v Washington*, 466 US 668, 689; 104 S Ct 2052; 80 L Ed 2d 674 (1984), reviewing courts are limited only to explanations for defense counsel's conduct given by defense counsel, and cannot "hypothesize[] an after-the-fact strategy" that "is not grounded in the record." While it is true that "courts may not indulge post hoc rationalization for counsel's decisionmaking that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions." *Harrington v Richter*, 562 US 86, 109; 131 S Ct 770; 178 L Ed 2d 624 (2011) (quotation marks and citation omitted). Instead, courts must "affirmatively entertain the range of possible" reasons that counsel may have had for proceeding as he or she did. *Cullen v Pinholster*, 563 US 170, 196; 131 S Ct 1388; 179 L Ed 2d 557 (2011). Here, we are affirmatively entertaining one possible reason for why counsel may have decided to not present the report (assuming that counsel knew of the report) that does not contradict the available evidence of counsel's actions.

[4] The report also states that defendant does not have any psychological history.

-4-

defendants with intellectual disabilities "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* The Court also explained that although defendants with intellectual disabilities are not exempt from criminal sanctions, such deficiencies "diminish their personal culpability." *Id.*

As observed by the trial court, this case is distinguishable from *Atkins* because it does not involve the death penalty. Defendant was given two life sentences with the possibility of parole as permitted by the fourth-offense habitual offender statute, MCL 769.12(1)(b). His argument that the trial court would have been necessarily precluded from imposing life sentences if it had the 1993 report at the time of sentencing is unpersuasive.

## B. CRUEL AND UNUSUAL PUNISHMENT

Next, defendant asserts that his life sentences violate the Michigan Constitution's prohibition of cruel or unusual punishment. We disagree.

The Michigan Constitution prohibits "cruel or unusual punishment." Const 1963, art 1, § 16. This prohibition encompasses "a prohibition on grossly disproportionate sentences." *People v Benton*, 294 Mich App 191, 204; 817 NW2d 599 (2011) (quotation marks and citations omitted).[5]

> [W]hether a penalty may be considered cruel or unusual is to be determined by a three-pronged test that considers (1) the severity of the sentence imposed and the gravity of the offense, (2) a comparison of the penalty to penalties for other crimes under Michigan law, and (3) a comparison between Michigan's penalty and penalties imposed for the same offense in other states. [*Id.*]

Defendant asserts that it is categorically cruel to sentence an individual with an intellectual disability to life imprisonment with the possibility of parole.[6] Yet Michigan does not have a categorical rule prohibiting a court from sentencing an individual with an intellectual disability to life imprisonment with the possibility of parole.

Moreover, because defendant was a fourth-offense habitual offender, it was within the trial court's discretion to sentence defendant to life imprisonment for his CCW and witness intimidation convictions. See MCL 769.12(1)(b). "This Court has previously held that habitual offender statutes 'are constitutional and the sentences under them are not cruel and unusual, because the state has a right to protect itself from individuals who continue to engage in criminal activities.' "

---

[5] The constitutional concept of proportionality is distinct from the nonconstitutional principle of proportionality discussed in *People v Milbourn*, 435 Mich 630, 650, 461 NW2d 1 (1990). *Benton*, 294 Mich App at 204.

[6] Again, defendant's support for his assertion that he suffers from an intellectual disability is the 1993 social worker evaluation.

*People v Burkett*, ___ Mich App ___, ___; ___NW2d ___ (2021) (Docket No. 351882); slip op at 3, quoting *People v Curry*, 142 Mich App 724, 732; 371 NW2d 854 (1985).

Defendant counters that the severity of the sentences imposed (life sentences) and the gravity of his offenses (which, according to defendant, were "carrying a pocketknife" and "writing a threatening letter") are so disproportionate as to be cruel and unusual, and the trial court should have used its discretion to issue a less harsh punishment. Defendant's argument fails to actually consider the gravity of defendant's offenses and his lengthy criminal record.

The record does not specify the exact length of the knife that defendant was carrying when he was arrested following the assault, but no one referred to it as a "pocketknife." The only description of the knife was provided by an officer, who described the knife as a "large folding knife," and said that not many people carried knives as large as the knife that defendant possessed. The officer also said that defendant was carrying pantyhose with the legs cut off and tied together in a way that, in the officer's experience, allowed the pantyhose to be used as a mask. While defendant's CCW conviction was for carrying (not using) the knife, he previously committed violent offenses using a knife. His assault-with-a-dangerous-weapon conviction involved defendant putting a "bowie-type knife" to the victim's throat and threatening to kill her. Similarly, his armed robbery conviction involved defendant holding a knife to the victim's face and mouth. Accordingly, defendant's assertion that he was sentenced to life imprisonment for simply "carrying a pocketknife" is inaccurate and minimizes the circumstances that led to his sentence to an illogical extreme.

Similarly, defendant's assertion that he was sentenced to life imprisonment for simply "writing a threatening letter" minimizes the circumstances that led to his sentence. Defendant sent a letter to a 13-year-old victim, threatening to rape, torture, and kill her if she did not retract her trial testimony. The letter included hand drawn female genitals with red coloring, which was believed to represent blood. The letter was extremely graphic. Defendant threatened to rape the child with a baseball bat; to tie her to a tree and beat her; and even to kill her so that she would be dead like her deceased mother. Sadly, this was not the first time that defendant threatened to kill the child; he threatened to kill her several times during the armed robbery. Reducing the reason that defendant received a life sentence to his "writing a threatening letter" wholly ignores the cruelty with which defendant treated the child victim, as well as the other surrounding circumstances that, together, resulted in his sentence.

Those other circumstances included defendant's pattern of escalating assaultive behavior and violence against young girls and women. Defendant's earlier offenses involved grabbing his victims in public. Defendant then started to use weapons in his assaults. In the instant offenses, defendant committed the CSC-IV while in possession of a knife about two weeks after he committed the armed robbery. He committed the armed robbery on the day that he was released from prison for his assault-with-a-dangerous-weapon conviction. Defendant sent the letter threatening to kill the then-13-year-old victim that testified against him while he was incarcerated for the armed robbery conviction.

Given the seriousness of defendant's offenses and his extensive criminal history, defendant's life sentences with the possibility of parole were not so grossly disproportionate as to constitute cruel or unusual punishment.[7]

Ultimately, we do not believe that defendant has established even the first prong of the test for whether his punishment was cruel or unusual under the Michigan Constitution. See *Benton*, 294 Mich App at 204 (stating that the first prong of the three-prong test is "the severity of the sentence imposed and the gravity of the offense").[8] Defendant's sentences reflect the seriousness of his offenses, and defendant otherwise ignores his escalating criminal behavior and the fact that, as previously stated, "the state has a right to protect itself from individuals who continue to engage in criminal activities." *Burkett*, ___ Mich App at ___;slip op at 3 (quotation marks and citation

---

[7] We acknowledge that because defendant's life sentence for witness intimidation is to be served consecutively to his 45- to 100-year sentence for the armed robbery, defendant—who was 25 years old at the time of his sentencing—may spend the rest of his life in prison. However, defendant is not constitutionally entitled to parole. See, e.g., *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013) (rejecting the defendant's claim that sentencing a 49-year-old to a 100 to 150 years' imprisonment amounted to cruel or unusual punishment).

[8] Defendant does not address other parts of the test for whether his punishment was cruel or unusual—a comparison of the penalty to penalties for other crimes under Michigan law, and a comparison between Michigan's penalty and penalties imposed for the same offense in other states—so any claim to that effect is abandoned. See *Bowling*, 299 Mich App at 559 ("[A]n appellant may not simply announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position.") (Quotation marks and citation omitted.)

omitted). As a result, he has failed to demonstrate that his life sentences constitute cruel or unusual punishment under the Michigan Constitution.[9, 10]

---

[9] This Court permitted the filing of an amicus brief in this case, *People v Parnell*, unpublished order of the Court of Appeals, entered December 21, 2021 (Docket No. 357004), in which the amici argues that the trial court's failure to consider rehabilitation in issuing its sentence amounted to cruel punishment in violation of the Michigan Constitution. Amici bases this argument on the following statement made by the trial court during sentencing: "I believe that deterrence, disciplining the offender, and protection of the public are by far the more important variables in sentencing." Two considerations, taken together, lead us to reject amici's argument. First, in the statement relied on by amici, the trial court never suggested that it was not considering rehabilitation as part of its sentencing, only that the court considered other factors to be "by far the more important variables in sentencing." Second, there is no requirement either in Michigan caselaw or the Michigan Constitution that requires a sentencing court to state on the record that it considered rehabilitation as part of its sentence. See *People v Boykin*, ___ Mich ___; ___ NW2d ___ (2022) (Docket Nos. 157738; 158695); slip op at 16 (stating that the Michigan Supreme Court has "never before . . . imposed a requirement that a sentencing court give a detailed on-the-record explanation of one or more specific factors"); *id.* at ___; slip op at 13-14 n 7 (stating that "there is an independent basis for an on-the-record articulation requirement under the Michigan Constitution"). Accordingly, even if a trial court's failure to consider rehabilitation in issuing its sentence amounted to cruel punishment under the Michigan Constitution, we would conclude that the trial court seemingly considered rehabilitation when issuing its sentence, even though it did not articulate this consideration on the record. But see *People v Girardin*, 165 Mich App 264, 268; 418 NW2d 453 (1987) (holding that a trial court's failure to consider a defendant's rehabilitation "does not destroy the propriety of the sentencing court's rationale").

[10] Defendant filed a supplemental brief following our Supreme Court's release of *People v Kemo Parks*, ___ Mich ___; ___ NW2d ___ (2022) (Docket No. 162086), arguing that *Kemo Parks* supports his argument that his sentences violate the Michigan Constitution. In *Kemo Parks*, our Supreme Court held "that mandatorily subjecting 18-year-old defendants convicted of first-degree murder to a sentence of life without parole violates the principle of proportionality derived from the Michigan Constitution, and thus constitutes unconstitutionally cruel punishment under Const 1963, art 1, § 16." *Id.* at ___; slip op at 35 (citations omitted). *Kemo Parks* does not support defendant's argument because it explicitly applies to "18-year-old defendants convicted of first-degree murder," and its reasoning throughout the opinion is exclusive to such defendants. See, e.g. *id.* at ___; slip op at 26 ("Eighteen-year-olds are at the peak of their risk for criminality because of the neuroplasticity of their brains, causing a general deficiency in the ability to comprehend the full scope of their decisions as compared with older adults."); *id.* at ___; slip op at 28-29 (reasoning that an 18-year-old defendant will likely serve a longer sentence than an equally culpable older defendant); *id.* at 29 (reasoning that an 18-year-old defendant will likely serve a longer sentence than an equally culpable juvenile defendant); *id.* at 30-31 (reasoning that numerous other states do not mandate life without parole for first-degree murder). Moreover, the *Kemo Parks* Court relied heavily on studies about the "brain science" of adolescents to reach its conclusion. See *id.* at ___; slip op at 18-22. While defendant can selectively quote from *Kemo Parks* to support his argument,

## C. PROPORTIONALITY

Defendant argues that even if his life sentences are constitutionally proportionate, they violate the nonconstitutional principle of proportionality discussed in *People v Milbourn*, 435 Mich 630, 650, 461 NW2d 1 (1990), as a disproportionate upward departure from the sentencing guidelines. We disagree.

Defendant was sentenced as a fourth-offense habitual offender under MCL 769.12. Under Michigan precedent, "the sentencing guidelines do not apply to the sentencing of habitual offenders." *People v Hansford*, 454 Mich 320, 323; 562 NW2d 460 (1997). As such, "the *Milbourn* proportionality standard need not be reached," *People v Cervantes*, 448 Mich 620, 629 n 17; 532 NW2d 831 (1995), and our review is simply "whether there has been an abuse of discretion." *Hansford*, 454 Mich at 323.

When it sentenced defendant, the trial court discussed defendant's criminal history, starting with his juvenile adjudications and detailing how defendant's crimes became gradually more violent over time. The instant offenses constituted defendant's fifth, sixth, seventh, and eighth felony convictions. In the course of describing defendant's criminal history, the court noted how defendant's crimes tended to occur only a short time after he finished serving a sentence for a previous crime. The court also considered defendant's misconduct tickets for threatening behavior that defendant received while incarcerated. The court lastly addressed the circumstances underlying his current offenses. With respect to defendant's convictions underlying his appeal in Docket No. 357004, the court emphasized that although defendant did not display the weapon during the assault, he was carrying that weapon illegally and he had previously used weapons in his other crimes. With respect to the witness intimidation conviction, the court noted that the letter was sent while respondent was imprisoned, and opined that the letter he sent the child victim was "unusually perverse" and "vile." The court concluded that defendant was "simply out of control," and then imposed the life sentences. In a written statement accompanying its sentence, the trial court reiterated its reasons for sentencing defendant as it did, and stated that it believed that, based on its articulated reasons, "the maximum sentences possible should be imposed" in this case.

In determining whether defendant's sentence was an abuse of discretion, we find persuasive our Supreme Court's reasoning in *Hansford*:

> In the instant case, the underlying felony was defendant's *eighth*, which was committed while on parole from prison where he was serving a sentence for the commission of a different felony. *We believe that a trial court does not abuse its discretion in giving a sentence within the statutory limits established by the Legislature when an habitual offender's underlying felony, in the context of his previous felonies, evidences that the defendant has an inability to conform his conduct to the laws of society.* The sentence in this particular case was within the

---

we are not persuaded that the holding of *Kemo Parks* is broader than its clearly demarcated parameters—it applies only to "18-year-old defendants convicted of first-degree murder," *id*. at ___; slip op at 35, and defendant is not that.

limits authorized by the Legislature for an habitual offender, fourth offense, under MCL 769.12(1)(a). The serious nature of this crime, defendant's extensive criminal history, and his clear inability to reform, convince us that the trial court did not abuse its discretion in imposing defendant's sentence. [*Hansford*, 454 Mich at 352-326 (second emphasis added).]

Similar to the defendant in *Hansford*, defendant here was sentenced to his fifth, sixth, seventh, and eighth felony. And like in *Hansford*, the trial court here did not abuse its discretion because its sentences of life in prison were "within the statutory limits established by the Legislature," and the court adequately explained why defendant's "felony, in the context of his previous felonies, evidences that the defendant has an inability to conform his conduct to the laws of society." *Id.* at 326. Like defendant's previous convictions, defendant's convictions for CSC-IV, resisting a police officer, and CCW were committed just after defendant was released from prison, which showed a firm probability that defendant would commit similar offenses in the future. See *People v Horn*, 279 Mich App 31, 44-45; 755 NW2d 212 (2008) (stating that factors such as repeated offenses and failures at rehabilitation may constitute an acceptable justification for an upward departure). For his witness intimidation conviction, defendant was incarcerated as a result of the armed robbery case at the time that he wrote and sent the "unusually perverse" letter, again suggesting that incarceration does not deter defendant's criminal behavior. And all of defendant's felonies showed a pattern sexual offenses against women with an escalating course of violence.

On appeal, defendant argues that the trial court abused its discretion by departing from the sentencing guidelines, and that the resultant sentence otherwise violated the principle of proportionality. All such arguments lack merit because, again, neither the sentencing guidelines nor the *Milbourn* principle of proportionality apply to habitual offenders. *Hansford*, 454 Mich at 323; *Cervantes*, 448 Mich at 629 n 17.

Accordingly, for the reasons explained, the trial court did not abuse its discretion when it sentenced defendant. Defendant has not shown that he is entitled to resentencing.

D. RIGHT TO JURY TRIAL

Defendant finally asserts that the trial court sentencing him as a fourth-offense habitual offender violated his constitutional right to a jury trial. We disagree.

Defendant was sentenced as a fourth-offense habitual offender pursuant to MCL 769.12. MCL 769.12(1)(b) provides that "[i]f the subsequent felony is punishable upon a first conviction by imprisonment for a maximum term of 5 years or more . . . the court . . . may sentence the person to imprisonment for life or for a lesser term." MCL 769.13(1), in pertinent part, states that "the prosecuting attorney may seek to enhance the sentence of the defendant as provided under [MCL 769.12] by filing written notice of his or her intent to do so within 21 days after the defendant's arraignment on the information charging the underlying offense." According to MCL 769.13(5):

The existence of the defendant's prior conviction or convictions shall be determined by *the court*, *without a jury*, at sentencing, or at a separate hearing

-10-

scheduled for that purpose before sentencing. The existence of a prior conviction may be established by any evidence that is relevant for that purpose, including, but not limited to, 1 or more of the following:

> (a) A copy of a judgment of conviction.
>
> (b) A transcript of a prior trial or a plea-taking or sentencing proceeding.
>
> (c) A copy of a court register of actions.
>
> (d) Information contained in a presentence report.
>
> (e) A statement of the defendant. [Emphasis added.]

In *People v Zinn*, 217 Mich App 340, 345; 551 NW2d 704 (1996), this Court explained:

> It is well-settled that in a criminal trial the defendant's conviction must rest on evidence that proves beyond a reasonable doubt the existence of every fact necessary to constitute the crime charged and includes the right to a trial by jury. However, it has long been held that Michigan's habitual offender statutes are merely sentence enhancement mechanisms rather than substantive crimes. [Quotation marks and citation omitted.]

As a result, a "defendant is not entitled to a trial by jury or the right to be proved guilty of being a habitual offender beyond a reasonable doubt." *Id*. at 347.

In this case, the trial court concluded that defendant was a fourth-offense habitual offender on the basis of his previous convictions of armed robbery, CCW, assault with a dangerous weapon, and CSC-IV. These convictions were also detailed in defendant's presentence investigation report. See MCL 769.13(5)(d). On appeal, defendant does not challenge the existence of these previous convictions. Instead, he appears to argue that the trial court was not permitted to sentence defendant as a habitual offender without that determination being made by a jury. However, defendant is not entitled to a jury to determine whether he is a habitual offender. See *Zinn*, 217 Mich App at 347. The trial court properly concluded that defendant was a fourth-offense habitual offender pursuant to MCL 769.13(5). Accordingly, the trial court was permitted to sentence defendant, as a fourth-offense habitual offender, up to life imprisonment. MCL 769.12(1)(b). Defendant's argument that he is entitled to resentencing is without merit.

Affirmed.

/s/ Colleen A. O'Brien
/s/ James Robert Redford

-11-