*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANN MARIE WALSH,

        Defendant-Appellant.

UNPUBLISHED
August 22, 2024

No. 365858
Macomb Circuit Court
LC No. 20-000698-FC

Before: MURRAY, P.J., and BORRELLO and MARIANI, JJ.

PER CURIAM.

Defendant was convicted following a jury trial of first-degree vulnerable adult abuse, MCL 750.145n(1), and sentenced to 57 to 180 months' imprisonment. Defendant appeals as of right, challenging both her conviction and sentence. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

This case arose out of allegations that defendant had physically abused her 85-year-old mother, Barbara Walsh (the victim). Defendant and the victim lived together in an apartment. On August 5, 2019, paramedics arrived at defendant's apartment in response to defendant's 9-1-1 call about a "weak person" who was "on the ground." Upon their arrival, the paramedics found the victim lying on her back on the floor, wearing a shirt and an adult diaper. She was unresponsive, cold, and looked pale. There was also testimony that the victim had bruising around her eyes, which is a typical sign of head trauma, as well as significant bruising of different colors and in different stages of healing all over her body and the lower part of her face. Defendant reported that the victim had fallen out of bed two days earlier and had been combative, so she decided to leave her on the floor. Defendant indicated that she now needed help getting the victim up from the floor. Additionally, defendant explained that the victim fell frequently and had suffered the bruising as a result of those falls. The victim was transported to the hospital.

The victim was diagnosed with sepsis and hypothermia. It was also determined that there was bleeding on the victim's brain and that she was not expected to live. The victim had an acute rib fracture, as well as other chronic rib fractures that were in various stages of healing. She also was dehydrated and had pneumonia and a urinary tract infection. While in the hospital, the victim

was not responsive and was unable to talk to anyone or describe what had happened to her. She never fully regained consciousness or became responsive during her time in the hospital, eventually succumbing to her injuries on August 31, 2019.

Macomb County Deputy Chief Medical Examiner Dr. Mary Pietrangelo performed an autopsy the next day and determined that the victim's cause of death was complications of sepsis, with a contributory cause of death being multiple blunt traumatic injuries. Dr. Pietrangelo specifically noted a large bruise on the victim's forehead, a fractured nasal bone, purple and yellow bruising around the eyes, and various bruises and abrasions around the victim's head and face. Dr. Pietrangelo observed a subdural hemorrhage that was in a stage of healing, bleeding in the muscles on either side of the spine, and various other bruises and abrasions on the arms and legs. Dr. Pietrangelo's determination that the victim's death was a result of homicide is based on defendant's failure to seek medical care for the victim. According to the medical examiner, defendant, as the sole individual with prolonged contact with the victim, should have recognized signs of illness or injury. This evidence led the medical examiner to determine the manner of death was homicide.

Defendant was charged with first-degree vulnerable adult abuse and felony murder. At trial, Sandra Wilson testified that she lived in the apartment across the hall from defendant and the victim. Sandra's granddaughter, Dinah Wilson, also lived with Sandra.[1] Sandra testified that when the victim and defendant first moved in, she saw the victim frequently and the victim was able to "get around on her own" while using a walker. Dinah testified that the victim and defendant appeared to have a typical "older mother and older daughter relationship," living together and "help[ing] each other out." However, by August 2019, Sandra no longer saw the victim walking around the building very often, although Sandra still saw the defendant going outside to smoke cigarettes and drink coffee. Dinah testified that the relationship between the victim and defendant became "hostile." Dinah "didn't see them together anymore really." Sandra and Dinah both testified that late at night on July 31, 2019, they heard loud banging noises coming from defendant's apartment and heard the victim crying out and screaming for defendant to stop hurting her and to stop beating her.

Scott Backers, a maintenance worker at defendant's apartment building, testified he spoke to defendant while the police were at her apartment. Defendant told him she was being investigated for abuse and stated: "I hit my mother." When defendant spoke to detective Steven Rupkus, she seemed to indicate that the victim's injuries were the result of falls. The prosecution presented evidence showing there were multiple bloodstains, including transfer stains and spatter stains, in various places within the apartment. Samples from some of the blood stains in the apartment were tested and determined to be from the victim.

The jury found defendant guilty of first-degree vulnerable adult abuse but not guilty of felony murder. Defendant was sentenced as previously stated. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

---

[1] Sandra's daughter and another granddaughter also lived in the apartment.

Defendant first argues on appeal that the evidence presented by the prosecution was insufficient to support defendant's conviction of first-degree vulnerable adult abuse.

"We review de novo challenges to the sufficiency of the evidence, examining the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could have found every essential element proved beyond a reasonable doubt." *People v Mitchell*, 301 Mich App 282, 289-290; 835 NW2d 615 (2013). "All conflicts in the evidence must be resolved in favor of the prosecution and we will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses." *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008). "Circumstantial evidence and reasonable inferences arising therefrom may be sufficient to prove the elements of a crime." *People v Nelson*, 234 Mich App 454, 459; 594 NW2d 114 (1999).

"A caregiver is guilty of vulnerable adult abuse in the first degree if the caregiver intentionally causes serious physical harm or serious mental harm to a vulnerable adult." MCL 750.145n(1); see also *People v Cline*, 276 Mich App 634, 642; 741 NW2d 563 (2007). Hence, "to prove first-degree vulnerable-adult abuse, the prosecution [must] show that a defendant intentionally caused serious physical [or mental] harm" to a vulnerable adult. *People v Comella*, 296 Mich App 643, 650; 823 NW2d 138 (2012).

For purposes of this statute, "caregiver" means "an individual who directly cares for or has physical custody of a vulnerable adult." MCL 750.145m(c). As relevant to the circumstances of this case, "vulnerable adult" means an "individual age 18 or over who, because of age, developmental disability, mental illness, or physical disability requires supervision or personal care or lacks the personal and social skills required to live independently." MCL 750.145m(u)(*i*).[2] Although MCL 750.145n(1) refers to serious physical or mental harm, the jury in this case was not instructed regarding mental harm and was instead only instructed on the necessity to find that defendant intentionally caused serious *physical* harm in order to find defendant guilty of this offense. "Serious physical harm" means "a physical injury that threatens the life of a vulnerable adult, that causes substantial bodily disfigurement, or that seriously impairs the functioning or well-being of the vulnerable adult." MCL 750.145m(r).

On appeal, defendant does not advance any argument that she was not the victim's "caregiver," nor does defendant advance any argument that the victim was not a vulnerable adult. Moreover, there was evidence that defendant lived with the victim and helped take care of her. There was also evidence that the victim was 85 years old, used an assistive device for walking, and had recently been leaving the apartment less often. A rational jury could have found from the record evidence that the victim was a vulnerable adult and that defendant was her caretaker. MCL 750.145m(c) and (u)(*i*).

Defendant's appellate argument instead focuses solely on whether the prosecution produced sufficient evidence to prove that defendant intentionally caused serious physical harm to

---

[2] There are additional statutory definitions of "vulnerable adult." However, the jury was only instructed in accordance with the definition in MCL 750.145m(u)(*i*) when the court provided the instructions for first-degree vulnerable adult abuse.

the victim. At trial, the prosecution presented evidence demonstrating that on July 31, 2019, two of defendant's neighbors heard loud noises coming from defendant's apartment and the victim yelling at defendant to stop hurting and beating her. There was further evidence that a few days after the Wilsons heard loud noises coming from defendant's apartment, defendant called 911 and firefighters and paramedics found the victim unresponsive, wearing only a diaper and a shirt. She was covered in bruises and other injuries, there were indications of head trauma, and the victim had a fractured rib and nasal bone. Defendant admitted that she hit the victim. There was additional evidence that multiple stains from the victim's blood were found in the apartment and that the victim never became responsive again after she was taken to the hospital.

Defendant contends that her conviction must be reversed because there was also evidence at trial that the victim's injuries could have been caused by falls. However, it is not the role of an appellate court reviewing a challenge to the sufficiency of the evidence to interfere with the jury's determinations on the weight and credibility of the evidence. *Unger*, 278 Mich App at 222. "Circumstantial evidence and reasonable inferences arising therefrom may be sufficient to prove the elements of a crime." *Nelson*, 234 Mich App at 459. Conflicts in the evidence are resolved in favor of the prosecution on appellate review. *Unger*, 278 Mich App at 222. "Because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient to establish a defendant's intent . . . ." *Id*. at 223.

Viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence from which a rational trier of fact could find that defendant intentionally caused serious physical harm to the victim. MCL 750.145n(1); MCL 750.145m(r); *Mitchell*, 301 Mich App at 289-290. We affirm defendant's conviction of first-degree vulnerable adult abuse.

III. SENTENCING

Next, defendant argues that offense variable (OV) 3 and OV 7 were improperly scored.

"Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013), superseded by statute on other grounds as stated by *People v Rodriguez*, 327 Mich App 573, 579 n 3; 935 NW2d 51 (2019) (citations omitted). "Clear error is present when the reviewing court is left with a definite and firm conviction that an error occurred." *People v Fawaz*, 299 Mich App 55, 60; 829 NW2d 259 (2012) (quotation marks and citation omitted). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Hardy*, 494 Mich at 438.

Defendant first argues that the assessment of 100 points for OV 3 was erroneous. MCL 777.33 provides in relevant part as follows:

> (1) Offense variable 3 is physical injury to a victim. Score offense variable 3 by determining which of the following subdivisions apply and by assigning the number of points attributable to the applicable subdivision that has the highest number of points:
>
> (a) A victim was killed ……………………………………………. 100 points

* * *

(c) Life threatening or permanent incapacitating injury occurred to a victim …. 25 points

* * *

(f) No physical injury occurred to a victim ……………………………….... 0 points

(2) All of the following apply to scoring offense variable 3:

* * *

(b) Score 100 points if death results from the commission of a crime and homicide is not the sentencing offense.

Defendant argues that the trial court was prohibited from assessing 100 points for OV 3 because the jury acquitted her of felony murder and therefore, assessing 100 points under OV 3 based on the victim's death violated the holding of *People v Beck*, 504 Mich 605, 629; 939 NW2d 213 (2019), that "due process bars sentencing courts from finding by a preponderance of the evidence that a defendant engaged in conduct of which he was acquitted."

The prosecution concedes on appeal that the 100-point score for OV 3 was erroneous and argues instead that 25 points should have been assessed because "[l]ife threatening or permanent incapacitating injury occurred to a victim." MCL 777.33(1)(c). Assessing 25-points for OV 3 would have been consistent with the jury's verdict convicting defendant of first-degree vulnerable adult abuse because, as described above, the jury necessarily found that defendant intentionally caused the victim "serious physical harm," meaning "a physical injury that threatens the life of a vulnerable adult, that causes substantial bodily disfigurement, or that seriously impairs the functioning or well-being of the vulnerable adult." MCL 750.145n(1); MCL 750.145m(r). Assessing 25 points thus would not run afoul of the holding in *Beck*. *Beck*, 504 Mich at 629; see also *People v Brown*, 339 Mich App 411, 423, 425; 984 NW2d 486 (2021) (noting that it is obviously consistent with *Beck* to sentence a defendant based on consideration of conduct of which the defendant has been convicted).

Defendant has not explained how assessing 25 points for OV 3 would have been erroneous and merely assumes that showing that 100 points was an erroneous score means that we must conclude that 0 points was the appropriate score. Clearly, this is an incorrect oversimplification of the statute. See MCL 777.33(1). Defendant has abandoned this argument by not fully developing and addressing the relevant implications for granting relief. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Muhammad*, 326 Mich App 40, 72 n 14; 931 NW2d 20 (2018) (quotation marks and citation omitted).

Next, defendant argues that OV 7 was erroneously assessed 50 points instead of 0 points because there was no evidence that the victim suffered injuries in excess of what was necessary to constitute the crime of first-degree vulnerable adult abuse. MCL 777.37 provides as follows:

-5-

(1) Offense variable 7 is aggravated physical abuse. Score offense variable 7 by determining which of the following apply and by assigning the number of points attributable to the 1 that has the highest number of points:

(a) A victim was treated with sadism, torture, excessive brutality, or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense …………………………………………… 50 points

(b) No victim was treated with sadism, torture, excessive brutality, or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense ……………………………………………. 0 points

(2) Count each person who was placed in danger of injury or loss of life as a victim.

(3) As used in this section, "sadism" means conduct that subjects a victim to extreme or prolonged pain or humiliation and is inflicted to produce suffering or for the offender's gratification.

"A trial court can properly assess 50 points under OV 7 if it finds that a defendant's conduct falls under one of the four categories of conduct listed in subsection (1)(a)." *Hardy*, 494 Mich at 439-440.[3] "OV 7 is designed to respond to particularly heinous instances in which the criminal acted to increase [a victim's] fear by a substantial or considerable amount." *Rodriguez*, 327 Mich App at 578 (quotation marks and citations omitted; alteration in original). The "focus of OV 7 is solely on conduct occurring during the [sentencing] offense." *Id*. (quotation marks and citation omitted; alteration in original). "In most . . . decisions addressing OV 7, the facts underlying the crime, whether falling under the definitions of sadism, torture, or excessive brutality, involved the defendant engaging in extreme and horrific actions." *Id*. at 580.

In this case, there was testimony that defendant's neighbors, the Wilsons, heard loud banging noises coming from defendant's apartment late at night on July 31, 2019, and they also heard the victim crying out and screaming for defendant to stop hurting her and to stop beating her. Dinah testified that the noises sounded like heavy furniture being moved and that the noises continued for about 10 minutes. It is reasonable to infer from this evidence that defendant brutally abused the victim for a prolonged period of time. Further, there was evidence defendant left the victim on the floor for days after beating her, without seeking assistance; defendant admitted the victim had been on the floor for a couple days before she called 911. Because defendant left the victim on the floor to suffer for days, it is reasonable to infer the victim suffered great anxiety and anguish as a result of defendant's brutality. There was also evidence about the extensive nature of the victim's injuries. The victim had multiple blunt force trauma injuries, including numerous bruises, broken bones, and a subdural hemorrhage. This further shows the extent of the brutality against the victim.

---

[3] However, the precise language of MCL 777.37(1)(a) has been amended *Hardy* was decided. See 2015 PA 137.

The severity of a victim's injuries may be considered for purposes of OV 7. See *People v McFarlane*, 325 Mich App 507, 534; 926 NW2d 339 (2018) (stating that for purposes of OV 7, the "severity of the injuries supported a finding that KM was treated with brutality in excess of that which necessarily accompanies the commission of first-degree child abuse"). The trial court did not err by assessing 50 points for OV 7.

Deducting 75 points from defendant's OV score, based on the erroneous assessment of 100 points rather than 25 points for OV 3, brings defendant's OV score from 160 to 85. This change does not affect defendant's guidelines range because he remains in OV level VI, which applies to any OV score of 75 or more for defendant's Class C[4] offense. See MCL 777.64. Thus, even accounting for this scoring error, defendant's guidelines range remains 29-57 months. MCL 777.64. "Where a scoring error does not alter the appropriate guidelines range, resentencing is not required." *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006).

Affirmed.

/s/ Christopher M. Murray
/s/ Stephen L. Borrello
/s/ Philip P. Mariani

---

[4] See MCL 777.16g (designating a violation of MCL 750.145n(1) as a Class C offense).